1    Andrew A. August, SBN 112851
     aaugust@bgrfirm.com
2    BROWNE GEORGE ROSS, LLP
     101 California Street, Suite 1225
3    San Francisco, California 94111
     Telephone (415) 391-7100 Fax (415) 391-7198
4
5    John G. Crabtree, *pro hac vice* anticipated
     jcrabtree@crabtreelaw.com
6    Charles M. Auslander, *pro hac vice* anticipated
     causlander@crabtreelaw.com
7    Brian C. Tackenberg, *pro hac vice* anticipated
     btackenberg@crabtreelaw.com
8    George R. Baise Jr., *pro hac vice* anticipated
     gbaise@crabtreelaw.com
9    CRABTREE & AUSLANDER
     240 Crandon Boulevard, Suite 101
10   Key Biscayne, Florida 33149
     Telephone (305) 361-3770 Fax: (305) 437-8118
11
12   Counsel for Plaintiffs Chuck Congdon, *et al.*[1]

13                 IN THE UNITED STATES DISTRICT COURT
14             FOR THE NORTHERN DISTRICT OF CALIFORNIA
                       SAN FRANCISCO DIVISION
15                     Case No. _____

16   CHUCK CONGDON, RYAN
     COWDEN, ANTHONY MARTINEZ,
17   JASON ROSENBERG, and JORGE
     ZUNIGA, on behalf of themselves and
18   all others similarly situated,
19
          *Plaintiffs,*                    COMPLAINT
20
     *vs.*                                 CLASS ACTION
21
     UBER TECHNOLOGIES, INC.,
22   a Delaware corporation,  RASIER,      DEMAND FOR JURY TRIAL
     LLC, a Delaware corporation, and
23   RASIER-CA, LLC, a Delaware corporation,
24
          *Defendants.*
25   _____/
26
27
     _____
28   [1] A complete list of the parties represented is set forth on the signature page below.
     CLASS ACTION COMPLAINT

## COMPLAINT

The Plaintiffs, Chuck Congdon, Ryan Cowden, Anthony Martinez, Jason Rosenberg, and Jorge Zuniga, individually and on behalf of all others similarly situated, sue the Defendants, Uber Technologies, Inc., a Delaware corporation and its wholly-owned subsidiaries, Rasier, LLC, and Rasier-CA, LLC (Uber Technologies and its Rasier subsidiaries will be collectively referred to as "Uber"):

### Overview

1.     Despite its unequivocal, written assurances that it would not do so, the ride-sharing service Uber took its "Safe Rides Fees" out of the fares that drivers charged riders on minimum fare rides between April 2014 and November 2015. This class action is a breach of written contract case against Uber on behalf of those drivers.

2.     Like newspapers, malls, and credit card companies, Uber competes in what economists call a "two-sided market"—a meeting place for two sets of agents (here, drivers and riders) who interact through an intermediary or platform (e.g., Uber).   http://lexicon.ft.com/Term?term=two_sided-markets  Uber serves over 400,000 drivers and millions of riders in the United States, but both drivers and riders who use Uber also often use its well-known competitor, Lyft, Inc.

3.     As the Uber driver contract emphasizes, the drivers who choose to use Uber are independent contractors and Uber is no more than an independent service provider to those drivers. By the terms of Uber's contract, the drivers are the sole owners of the fares that riders pay, and all fare payments from riders to Uber are deemed payments made directly from riders to drivers.

4.     Uber is contractually allowed to charge drivers a percentage-of-fare-based "service fee" for the service it provides them, but Uber cannot charge drivers any more than its contract with them permits; after all, the fare money belongs to the drivers according to Uber's contract, and Uber is just a service provider to the drivers—with no greater rights to ownership of those fares than a driver's CPA, lawyer, mechanic, or plumber. According to Uber's driver contract, ancillary driving expenses (taxes, tolls, etc.) are discretely charged to riders as a surcharge; are not part of the fare that drivers charge

riders; and thus are not subject to Uber's percentage-based service fee charged to drivers.

5.     Uber competes with Lyft and others for riders, and must assure potential riders that transportation on the service that *Uber* intermediates is safe.  To meet that marketing need, Uber instituted a "Safe Rides" program in April 2014, under which Uber subjected drivers using Uber's services to background checks.  (Lyft has a similar program.)  To help fund its own operating costs for the program, Uber instituted a "Safe Rides Fee" on each ride, instead of absorbing those marketing expenses internally.

6.     Uber's driver contracts provide that, by emailing drivers and announcing changes in "Fare Calculation," Uber can change the terms of the contract.  But when Uber instituted the Safe Rides program in April 2014, Uber then (and afterwards) emailed the drivers explaining that (as with other ancillary fees) the riders—not the drivers—would pay the Safe Rides Fee that Uber was collecting to help fund its operating costs: "**Riders** will begin paying a $1 Safe Rides Fee, covering background checks, insurance, and other safety initiatives." (Exhibit A; emphasis added).  "Uber will collect the $1 Safe Rides Fee from the **rider** . . . ." (*Id.*; emphasis added).

7.     After instituting the Safe Rides program, Uber's Service Fee Schedules and published local fare webpages continued to show the fares that riders would pay, including a minimum fare, for each area.  Consistent with its contract and its emails to drivers, those schedules and fare webpages also showed the new Safe Rides Fee as a separate surcharge for riders.  Until approximately November 2015, *nothing* in Uber's contract, schedules, emails, or fare webpages suggested that **drivers** would pay Uber's Safe Rides Fee out of the driver's own fares.

8.     Despite the clear terms of its written contracts—including Uber's incorporated emailed promises that it would not do so—Uber took its Safe Rides Fee charges out of the drivers' fares when drivers charged riders minimum fares.  In other words, when a driver provided a minimum fare ride, Uber did not charge the Safe Rides Fees to the riders (as a separate surcharge), but, instead, charged that fee to the drivers by taking it from their fare.

9.     By November 16, 2015, Uber had changed its local fare webpages to state: "The min fare

includes the Safe Rides Fee." By changing its fare webpages (which were expressly incorporated into the contract), Uber indicated for the first time that—on minimum fare rides—there was no longer a Safe Rides Fee charge to <u>riders</u>. In so doing, Uber (at least implicitly) stated that the Safe Rides Fee would come out of the drivers' fares on minimum fare rides (as opposed to being charged directly to the riders). Uber (at least arguably) has altered its driver contract to *prospectively* allow such charges to drivers.

10. Uber's change to its fare webpages illustrates awareness, from at least that point, of Uber's previous breach of its driver contract. Nonetheless, Uber has not refunded the Safe Rides Fees it took from drivers on the minimum fare rides for the preceding months. On behalf of themselves and all others similarly situated, the Plaintiffs demand that Uber now return that money to all of the proposed Main Class members without further delay.

**Parties (and Non-Party Uber Entities)**

11. Plaintiff Chuck Congdon resides in Tustin, California, and provides peer-to-peer transportation services as an UberX driver using "Uber Services."

12. Plaintiff Ryan Cowden resides in Chicago, Illinois, and provides peer-to-peer transportation services as an UberX driver using "Uber Services."

13. Plaintiff Anthony Martinez resides in San Jose, California, and provided peer-to-peer transportation services as an UberX driver using "Uber Services."

14. Plaintiff Jason Rosenberg resides in San Francisco, California, and provided peer-to-peer transportation services as an UberX driver using "Uber Services."

15. Plaintiff Jorge Zuniga resides in Mountain View, California, and provides peer-to-peer transportation services as an UberX driver using "Uber Services."

16. Defendant Uber Technologies, Inc. (Uber), is a Delaware corporation that is registered to do business in California and in each of the states where its Rasier entities are registered to do business.

17. Each of the following "Rasier" entities is a wholly-owned subsidiary of Uber:

      a)      Defendant Rasier-CA, LLC, a Delaware corporation registered to do business in

California.

     b)     Rasier-DC, LLC, a Delaware corporation registered to do business in Florida.

     c)     Defendant Rasier, LLC, a Delaware corporation registered to do business in a variety of states within the United States, including Colorado.

     d)     Rasier-PA, LLC, a Delaware corporation registered to do business in Pennsylvania.

     e)     Rasier-MT, LLC, a Delaware corporation registered to do business in Montana.

     f)     Hinter-NM, a Delaware corporation registered to do business in New Mexico.

     18.   Uber is an intended third-party beneficiary of the contacts entered by the Class Member drivers with the above-described Rasier entities.

## JURISDICTION AND VENUE

     19.   Venue in this District is proper pursuant to 18 U.S.C. § 1391(b)-(c) because Uber conducts business in this District and is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced, and because Uber's extensive contacts with this District are sufficient to subject it to personal jurisdiction. In addition, the contracts at issue in this case contain a venue provision requiring that any litigation arising out of the contracts be filed in San Francisco, California.

     20.   Jurisdiction is proper under 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 ("CAFA"), because the aggregate amount in controversy exceeds $5 million (exclusive of interest and costs), and as a national class at least one class member belongs to a different state than that of Uber; hence there is at least minimal diversity between the parties, over 100,000 members in each of the alleged classes, and less than two-thirds of the members of the classes will be citizens of California. Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

## GENERAL ALLEGATIONS

### The History of the Uber Driver Contracts in this Case

     21.   From the time the Safe Rides program launched in April 2014, there have been three

sequential UberX driver contracts relevant to the <u>substantive</u> issues in this case, with one additional contract issued after the breaches at-issue occurred (December 11, 2015); that last contract is primarily relevant to the arbitration-related issues in this case, though Uber's conduct under that contract reflects its current awareness of its earlier breaches.

22.   From the time the Safe Rides program launched until approximately June 21, 2014, drivers on the UberX platform did so under a form contract with Rasier, LLC; that contract—first implemented in 2013—was called the "Transportation Provider Service Agreement." (A true and correct copy of that agreement is attached to this Complaint as Exhibit B and will be referred to as the "2013 Agreement.").

23.   From approximately June 21, 2014 until approximately November 10, 2014, drivers on the UberX platform did so under an identical form contract, which geographically assigned one of two Rasier entities as the other party (Rasier-CA, LLC, for California drivers and Rasier, LLC, for the rest of the United States); that contract was called the "Rasier Software Sublicense & Online Services Agreement." (A true and correct copy of that agreement is attached to this Complaint as Exhibit C and will be referred to as the "June 2014 Agreement.").

24.   From approximately November 10, 2014 until approximately December 11, 2015, drivers on the UberX platform did so under an identical form contract, which geographically assigned one of three Rasier entities as the other party (Rasier-CA, LLC, for California drivers, Rasier-PA, LLC, for Pennsylvania drivers, and Rasier, LLC, for the rest of the United States); that agreement was called the "Software License and Online Services Agreement." (A true and correct copy of that agreement is attached to this Complaint as Exhibit D and will be referred to as the "November 2014 Agreement.")

25.   Since approximately December 11, 2015, drivers on the UberX platform have done so under an identical form contract, which geographically assigned one of six Rasier entities as the other party (Rasier-CA, LLC, for California drivers; Rasier-DC, LLC, for Florida drivers; Rasier-PA, LLC, for Pennsylvania drivers; Rasier-MT, LLC, for Montana drivers; Hinter-NM, LLC, for New Mexico drivers; and Rasier, LLC, for the rest of the United States); that contract is called the "Technology Services Agreement." (A true and correct copy of that agreement is attached to this Complaint as Exhibit E and

will be referred to as the "December 2015 Agreement.")

### How Fares Were Supposed to Have Been Calculated

(According to the 2013 Agreement, the June 2014 Agreement,
and the November 2014 Agreement)

26.   During the Class Period (as defined below for the Main Class and the alternative Issue Class), the Uber driver contracts consistently made clear that Uber was no more than a service provider to the driver; that each driver was a wholly independent business free to negotiate its own fares with riders; that each driver owned the fares paid by riders; that Uber would simply be paid a fee for the services it provided to the driver's business (like a CPA, a lawyer, a mechanic, or a plumber); and that the default fare and Uber's percentage-of-fare service fee were indicated in either the Uber "Service Fee Schedule" that drivers received, emails from Uber, Uber's local fare webpages (www.uber.com/cities), or a combination of those sources.

27.   The relevant provisions from the 2013 Agreement and the June 2014 Agreement are excerpted below:

- Rasier is engaged in the business of providing lead generation to the Transportation Provider comprised of requests for transportation service made by individuals using Uber Technologies, Inc.'s mobile application ("Clients"). Through its license of the mobile application ('Software'), Rasier provides a platform for Clients to connect with independent Transportation Providers.

- Rasier does not provide transportation services, and is not a transportation carrier. * * * The Company's business is solely limited to providing Transportation Providers with access, through its license to [Uber], to the lead generation service provided by the Software, for which the Company charges a fee ("Service").

- You are an independent transportation provider who offers rideshare or P2P transportation services . . . .

- You desire to enter into this Agreement as a Transportation Provider for the purpose of receiving the Service from the Company.

- [T]his Agreement shall give you the right to accept requests to perform on-demand transportation services ("Requests") received by you via the Software, for which you shall be paid a Service Fee (as described more fully below).

- You shall be entitled to accept, reject, and select among the Requests received via the Service. You shall have no obligation to the Company to accept any Request.

- Nothing in this Agreement shall preclude * * * you from entering into contracts similar to this Agreement with other lead generation providers.

- "In exchange for accepting and fully performing on a Request [to perform on-demand transportation services received by you via the Software] you shall be paid an agreed upon Service Fee for your completion of that Request. <u>Unless otherwise negotiated</u> at the time the [rider] Request is received by you, the Parties agree that <u>you shall be paid a Service Fee at the pre-arranged rates for each Request performed, which shall be forth in a Service Fee Schedule.</u> * * * Before any change to the rates set forth in the Service Fee Schedule may become effective, the Company shall provide notice of such change(s) to you via email, your mobile application or other written means." (Emphasis added).

- "The Company shall electronically remit payment of Service Fees to you consistent with Company's [ . . .] practices [ . . .] as set forth in the Service Fee Schedule."

- **Rasier's Fee** In exchange for your access to and use of the Software and Service, including the right to receive the Requests, <u>you agree to pay to the Company a fee for each Request accepted as indicated in the Service Fee Schedule.</u> (Emphasis added).

- **Relationship of Parties** This Agreement is between two co-equal, independent business enterprises that are separately owned and operated.

(Exhibits B and C, emphasis added).

28.   The relevant provisions from the November 2014 Agreement are excerpted below:

- "Company [i.e., the geographically-assigned Rasier entity], a subsidiary of Uber Technologies, Inc. ("Uber"), provides lead generation to independent providers of rideshare or peer-to-peer (collectively, "P2P") passenger transportation services using the Uber Services (as defined below). The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile applications. You desire to enter into this Agreement for the purpose of accessing and using the Uber Services.

- **You acknowledge and agree that Company is a technology services provider that does not provide transportation services.**

- "*Territory*" means the city or metro areas in the United States in which you are enabled by the Driver App to provide Transportation Services.

- "*Transportation Services*" means your provision of P2P passenger transportation services to Users via the Uber Services in the Territory using the Vehicle.

- "*Uber Services*" mean Uber's on-demand lead generation and related services licensed by Uber to Company that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services, <u>which services include Uber's software, websites</u>, payment services as described in Section 4 below, and related support services systems, <u>as may be updated or modified from time to time</u>.

- "*User*" means an end user authorized by Uber to use the Uber mobile   application for the

purpose of obtaining Transportation Services offered by Company's transportation provider customers [i.e., by the drivers].

• **Fare Calculation and Your Payment.** <u>You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services</u> ("Fare"), where such Fare is calculated based upon a base fare amount plus mileage and/or time amounts, <u>as detailed for the applicable Territory ("Fare Calculation")</u>. <u>You are also entitled to charge User for any</u> Tolls, taxes or <u>fees</u> incurred during the provision of Transportation Services . . . . <u>Company agrees to remit to you on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees</u> . . . . (Emphasis added).

• **Changes to Fare Calculation**. Company reserves the right to change the Fare Calculation at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of such change that would result in a change in the recommended Fare for each instance of completed Transportation Services. . . .

• **Service Fee**. In consideration of Company's provision of the Driver App and the Uber Services for your use and benefit hereunder, <u>you agree to pay Company a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare</u> (regardless of any Negotiated Fare), as provided or otherwise made available by Company from time to time for the applicable Territory <u>("Service Fee")</u>. In the event regulations applicable to your Territory require taxes to be imputed in the Fare, Company shall calculate the Service Fee based on the Fare net of such taxes. Company reserves the right to change the Service Fee at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of such change.

• **Modification**. Company reserves the right to modify the terms and conditions of this Agreement at any time, effective upon publishing an updated version of this Agreement on the portal available to you on the Uber Services. Company reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. You hereby acknowledge and agree that, by using the Uber Services, or downloading, installing or using the Driver App, you are bound by any future amendments and additions to this Agreement, information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations.

(Exhibit D, emphasis added).

29.   The 2013 Agreement and the June 2014 Agreement incorporated Uber's "Service Fee Schedules" to define the drivers' default fares and Uber's service fee charges to drivers (subject to Uber's later emails to its drivers).

30.   However, the 2013 Agreement and the June 2014 agreement also stated that "[the driver] and the Company shall always have the right to negotiate a Service Fee different from the pre-arranged

fee. The purpose of the pre-arranged Service Fee is only to act as the default fee in the event neither party negotiates a different amount." (Exhibit B at 5; Exhibit C at 5).

31.    The November 2014 Agreement provided that the default fares for drivers to charge riders were "as detailed for the applicable Territory ('Fare Calculation')" under "Uber Services," and that Uber Services included "Uber's . . . websites . . . as may be updated or modified from time to time." Uber's local fare webpages (www.uber.com/cities) detailed the default fares and Uber's service fees for each "applicable Territory," subject to any altering emails from Uber. (Exhibit D).

32.    Like the earlier agreements, the November 2014 Agreement also made clear, however, that (a) "the [default] Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event [the driver does] not negotiate a different amount;" and (b) the service fee the driver pays for Uber's services from the driver's fare is "on a per Transportation Services transaction basis calculated as a percentage of the Fare." (Exhibit D, emphasis added).

33.    The December 2015 Agreement states that default fares are set on Uber's local fare webpages: "as detailed at www.uber.com/cities for the applicable Territory ('Fare Calculation')." (Exhibit E). The December 2015 Agreement does not appear to govern the *substantive* claims in this case, however, because it was entered shortly after Uber changed its web-published fares regarding the Safe Rides Fees on minimum fare rides.

### Uber's Safe Rides Program

34.    Around April 18, 2014, Uber announced that it would begin collecting a $1 Safe Rides Fee from riders for each trip. (Exhibit A).

35.    When the Safe Rides Fee went into effect, Uber emailed drivers, explaining that "***Riders will begin paying a $1 Safe Rides Fee***, covering background checks, insurance, and other safety initiatives." (Exhibit A, emphasis added).

36.    Uber also explained that the new fee would not reduce the drivers' earnings.

(Exhibit A, partially redacted).

37.   Uber reiterated in email to its drivers that "Uber will collect the $1 Safe Rides Fee *from the rider*." (Exhibit A, emphasis added).

> If you are a ridesharing partner, Uber will collect the $1 Safe Rides Fee from the rider, so that this price increase will not affect your earnings. A sample trip fare calculation is below.

(Exhibit A).

38.   Consistent with its assurances, Uber provided the following example to drivers  when it implemented the Safe Rides Fee in April 2014 showing that the Safe Rides Fee was independent of the "fare," *i.e.*, the Safe Rides Fee would be added on top of the "fare" as  an additional direct fee to the rider:

| | Old | New (ridesharing) |
|---|---|---|
| **Fare** | $10.00 | $10.00 |
| **Safe Rides Fee** | -- | $1.00 |
| **Total Rider Payment** | $10.00 | $11.00 |
| **Partner Earnings Description** | 80% of Fare | 80% of Fare |
| **Partner Earnings** | $8.00 | $8.00 |

(Exhibit A).

39.   The November 2014 Agreement also expressly provided that fare payments from riders to Uber were, contractually, deemed payments made directly from riders to drivers ("payment made by [a rider] to [Uber] shall be considered the same as payment made directly by [the rider] to [the driver]"), because Uber did not own those fares.

40.   By contract, and as confirmed by Uber's emails, the Safe Rides Fee was not part of the "Service Fee" that Uber could lawfully charge drivers against the fares that the (independent-contractor) drivers charged their riders during the Class Period.

41.   As with any business receiving services from an independent service provider, drivers were only obligated to pay Uber that portion of their revenues (fares, here) the drivers contractually *agreed* to pay that independent service provider.

42.   During the Class Period defined below, nothing in Uber's driver contracts, emails, Service Fee Schedules, or webpages stated that drivers would pay Uber's Safe Rides Fee out of the drivers' fares; to the contrary, and by the terms of the contracts, the drivers remained contractually entitled to their fares that they charged riders, subject only to an obligation to pay independent service provider Uber its Service Fee, as detailed by the driver contracts.

43.   On Uber's website for each city, state, and/or defined locality ("Territory")  where Uber services are available (http://www.uber.com/cities), Uber putatively discloses, and has putatively disclosed, its fare and Safe Rides Fee information ("Safe Rides Disclosure") since the beginning of its Safe Rides program.  As composite Exhibit G makes clear, the Territory webpages did not disclose that the Safe Rides Fee was included in the quoted minimum fare found on those webpages until approximately November 2015, at which time the Territory webpages were changed to reflect that the Safe Rides Fee was actually included within the Minimum Fare.

44.   Similarly, the Service Fee Schedules (example below) never suggested that the minimum fare included the Safe Rides Fee:



(Exhibit F).

     45.   But on each minimum fare trip Uber actually took the Safe Rides Fee out of the drivers' own fares, as opposed to adding that fee on top of those fares and charging it to the rider (which is what Uber did on the other fares that drivers earned).

     46.   In other words, Uber made the drivers absorb Uber's Safe Rides Fee—an Uber internal operating expense to meet its competitive marketing needs—out of the fares that the drivers contractually *owned*; so this Uber operating cost was not passed on to the riders, as the driver contract (amended through Uber's own emails, schedules, and local fare pages) required.  Instead, the Safe Rides Fee was paid by the drivers on minimum fare rides.

     47.   As of November 16, 2015, Uber amended its local fare webpages to state, for the first time, that **the "min[imum] fare includes the Safe Rides Fee."**  (Composite Exhibit G, emphasis added). An example of this change is illustrated here:



MOVING WASHINGTON D.C.

(Composite Exhibit G).

48.   In addition to this exemplar, the Plaintiffs have gathered 328 images from Uber's separate Territory webpages (the "Images") that accurately reflect Uber's Safe Rides Disclosure for individual Territories on specified dates before and after the class period.  *See* Composite Exhibit G.

49.   The Images confirm the allegations in this Complaint; they consistently establish  that, during the class period, Uber failed to disclose on its Territory webpages that the Safe Rides Fee was part of the minimum fare during the Class Period.

50.   In conjunction with an effort to settle a consumer class action brought by riders (http://www.bloomberg.com/news/articles/2016-02-11/uber-settles-claims-its-safe-rides-fee-misled-passengers), Uber later rebranded its "Safe Rides Fee" as a "Booking Fee," which is how the charge is currently characterized on Uber's schedules and local fare webpages.

51.   On approximately December 11, 2015, Uber changed its driver contract to  expressly incorporate Uber's local fare webpages.

### *Arbitration Clauses within the Agreements*

52.   The 2013 Agreement contains a putative mandatory arbitration provision with a class action waiver.  For the reasons detailed in the June 9, 2015 order issued by U.S. District Court Judge Chen of the Northern District of California, *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1217 (N.D. Cal. 2015), that provision and class action waiver are unenforceable.  Specifically, the arbitration provision in

the 2013 Agreement was:

a)   procedurally unconscionable because it was "highly inconspicuous, surprising, and oppressive"; and

b)   substantively unconscionable because it contained (i) a requirement that drivers split the full cost of arbitration, which included costs that the drivers would not be required to pay in a court proceeding; (ii) an unconscionable PAGA waiver; (iii) an unconscionable confidentiality clause; (iv) an improper intellectual property carve out; and (v) an unconscionable unilateral modification provision.

53.   The June 2014 Agreement contains a putative mandatory arbitration provision with a class action waiver.  For the reasons detailed in the June 9, 2015 order issued by Judge Chen, *Mohamed*, 109 F. Supp. 3d at 1237, that provision and class action waiver are unenforceable.  Specifically, the arbitration provision in the June 2014 Agreement was:

a)   procedurally unconscionable due to Uber's failure to conspicuously disclose the disadvantageous terms of the arbitration agreement; and

b)   contained the same substantively unconscionable terms as the 2013 agreement, and included a non-severable, unconscionable PAGA waiver provision  rendering the arbitration clause unenforceable in its entirety.

54.   The November 2014 Agreement contains a putative mandatory arbitration provision with a class action waiver.  For the reasons detailed in the December 9, 2015 order issued by Judge Chen, *O'Connor v. Uber Techs.*, Inc., 311 F.R.D. 547, 563 (N.D. Cal. 2015), that provision and class action waiver are unenforceable.   Specifically, the November 2014 Agreement's blanket PAGA waiver was unenforceable as a matter of public policy, and—because that provision of the arbitration agreement was not severable—the entire arbitration agreement was rendered unenforceable.

55.   The December 2015 Agreement contains a putative mandatory arbitration provision with a class action waiver.  It—like the other driver contracts alleged in this Complaint—requires drivers to split arbitration costs with Uber; makes those split arbitration costs nonrecoverable <u>even for prevailing</u>

drivers; and requires that all arbitration claims be filed on an "individual" basis, thus barring drivers from filing claims together to spread litigation costs. Like the other contracts, the December 2015 Agreement only bars class actions in arbitration; it does not bar class actions for claims that are not subject to arbitration.

### A Substantive, Contractual Right to Effectual Awards

56.   The December 2015 Agreement and the other driver contracts alleged in this Complaint each grant the class member drivers a substantive, contractual right to not only their fares (minus only the Uber percentage-based service fee) but also *effectual* awards for claims otherwise subject to the contract's arbitration clause.

57.   In furtherance of this contractual right, the December 2015 Agreement and the other driver contracts expressly permit drivers to obtain not only "temporary" injunctive relief, but also "preliminary injunctive relief" whenever the award that drivers seek would "be rendered ineffectual" without such relief:

> • **"A party may apply to a court of competent jurisdiction for** temporary or **preliminary injunctive relief** in connection with an arbitrable controversy, but only **upon the ground that the award to which that party may be entitled may be rendered ineffectual** without such provisional relief."** (Exhibit E; emphasis added).

58.   Like the other driver contracts alleged in this Complaint, the December 2015 Agreement requires drivers to split all costs of arbitration that are of the "type of fee or expense" that would be incurred in a court, **even if the driver prevails:**

> • "If successful on [arbitration] claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above)." (Exhibit E at 16; emphasis added).
>
> • "If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, you will not be required to bear any *type* of fee or expense that you would not be required to bear if you had filed the action in a court of law. Any disputes in *that* regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute." (Exhibit E at 20; emphasis added).

59.   The contract requires the use of a JAMS (Judicial Arbitration & Mediation Services)

arbitrator and the JAMS Streamlined Arbitration Rules & Procedures rules unless the parties otherwise agree on an arbitrator.

60.   The current (October 1, 2015) "Instruction for Submittal of Arbitration to JAMS," http://www.jamsadr.com/files/Uploads/Documents/JAMS_Arbitration_Demand.pdf, provides:

> "Initial filing fee. (For two-party matters, the filing fee is $1,200. For matters involving three or more parties, the filing fee is $2,000.) The entire filing fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation."

61.   A filing fee (unlike the JAMS "Professional Fees") is the "type of fee or expense" that the Plaintiffs and the other class members would be required to pay if they had filed an action in court; so there is no "dispute[] in that regard" for an arbitrator to resolve, and thus there is no contractual basis to have Uber bear those fees "until such time as the Arbitrator resolves any such dispute."

62.   Uber drafted its driver contracts (i) to bar arbitration class actions and any other driver-joined actions—permitting only "individual" claims; (ii) to require courts, not arbitrators, to determine the enforceability of that class action bar; and (iii) to require that, if a court finds the class action bar is unenforceable for a given case, the ensuing class action *must* proceed in court.

63.   For any driver to arbitrate individually against Uber Technologies and its regional Rasier entity, the driver and those two parties must always, per JAMS, collectively pay $2,000 in filing fees because there will always be three parties.

64.   Regardless of whether a driver prevails, "such [filing] fee(s) will be apportioned equally between the Parties" under the terms of the driver contracts; so—unlike in a court case—every prevailing driver with a successful breach of contract claim will always pay $666.66 in **non-recoverable** filing fees, which makes effectual relief impossible for drivers with claims for less than that sum.

65.   The class members who ceased working for Uber before the December 2015 Agreement went into effect are subject to contracts that contain arbitration provisions that this Court has previously determined are unenforceable because they are unconscionable, as detailed in Judge Chen's June 9, 2015

and December 9, 2015 orders.  Judge Chen determined that the 2013 Agreement was substantively unconscionable due, in part, to the arbitration cost-splitting provision (which required drivers to pay costs that were not of the type they would have advanced in a court proceeding).  Judge Chen determined that the June 2014 and November 2014 Agreements were also unconscionable, but on other grounds.

66.   In addition, the class members who ceased working for Uber before the December 2015 Agreement went into effect will—like those who entered the December 2015 Agreement—automatically lose money in underlined every arbitration under the terms of the earlier agreements, to the extent the arbitration clauses in the earlier agreements they last entered are otherwise enforceable and apply to those drivers.

67.   The fee splitting requirement spelled out in all the driver contracts—even for those drivers who prevail—not only denies Class Members their substantive contractual right to *effectual* relief, it is also unconscionable as to any potential claims for less than the sum that any driver would be required to pay for the privilege of arbitrating a claim on an individual basis.  By promising effectual relief in one provision while denying that relief in the arbitration provision, the December 2015 Agreement is further substantively unconscionable.

68.   The December 2015 Agreement is procedurally unconscionable because, as with the previous contracts, it is an adhesion contract (the parties entering into it felt pressure to agree to the contract to continue using Uber services) and, as an adhesion contract, failed to disclose (i.e., bring to the driver's attention) the disadvantageous terms that were included in the contract, including the contractual arbitration fee-splitting provision.

69.   While the contracts provide that Uber will pay arbitration fees if it is required to  do so "under applicable law," the substantive claims at-issue in this case are common law breach of contract claims: there is no enforceable state or federal law that requires Uber to pay arbitration fees for such common law claims.

70.   Those nonrecoverable filing fees are more than the underlined maximum breach of contract damages

for the vast majority of class members in this case; so the award to which each such driver is entitled will "be rendered *ineffectual*" (emphasis added) in individual arbitrations.

71.  Any offer by Uber to pay the drivers' individual arbitration fees at this juncture would be legally ineffective and would not alter the fact that the contracts—as written by Uber—render the relief obtainable through arbitration ineffectual and the contract chilling to those drivers who consider bringing common law breach of contract claims against Uber for less than the nonrecoverable portion of the filing fees.

72.  As Judge Chen concluded when Uber attempted to pay unconscionable arbitration fees on behalf of its drivers, such an after-the-fact concession "can be seen, at most, as an offer to modify the contract; an offer that was never accepted.  No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it." *Mohamed*, 109 F. Supp. 3d at 1210 (citing *Armendariz v. Found. Health Psychcare Services, Inc.*, 6 P. 3d 669, 697 (2000)).  Additionally, it would be improper for the Court itself to rewrite the parties' contract to get around the ineffectual relief offered thereby.  As Judge Chen touched upon, courts do not have the power to reform contracts in such a manner.  *O'Connor v. Uber Techs., Inc.*, 311 F.R.D. 547, 558 n.10 (N.D. Cal. 2015).

73.  The bar on the joinder of claims, the requirement that arbitration filing fees are non-recoverable for prevailing drivers, and the class action waivers in the December 2015 Agreement, and the other driver contracts, render the arbitration provisions within those contracts unenforceable because they cumulatively deny drivers *any* relief on claims for less  than the nonrecoverable arbitration filing fees—despite a contractual, substantive right to *effectual* relief.

74.  The same driver contract also gives drivers a substantive property right in their fares—a contractually-granted property right that cannot be subjugated to the contract's procedural device for vindicating such rights.

75.  However, even if the arbitration provisions were not *unenforceable* in their entirety by the terms of the driver contracts themselves, since individual arbitrations are patently *ineffectual* for the vast majority of drivers, each class-member driver is contractually entitled to preliminary injunctive relief

barring arbitration to the extent any such driver would otherwise be required to arbitrate claims individually.

## SPECIFIC ALLEGATIONS REGARDING CLASS REPRESENTATIVES

### Class Representative Chuck Congdon

76.   Plaintiff Chuck Congdon began working as an Uber driver on the UberX platform in January 2014, before the Safe Rides program began.

77.   Plaintiff Congdon undertook approximately 208 minimum fare trips, and due to its actions, Uber reduced those fares on those trips by the amount of the Safe Rides Fees.

### Class Representative Ryan Cowden

78.  Plaintiff Ryan Cowden began working as an Uber driver on the UberX platform in August 2015, after the Safe Rides program began.

79.   Plaintiff Cowden undertook approximately 5 minimum fare trips, and due to its actions, Uber reduced those fares on those trips by the amount of the Safe Rides Fees.

### Class Representative Anthony Martinez

80.   Plaintiff Anthony Martinez began working as an Uber driver on the UberX platform in April 2014, before the Safe Rides program began.

81.   Plaintiff Martinez undertook 145 minimum fare trips, and due to its actions, Uber reduced those fares on those trips by the amount of the Safe Rides Fees.

### Class Representative Jason Rosenberg

82.   Plaintiff Jason Rosenberg began working as an Uber driver on the UberX platform in October 2013, before the Safe Rides program began.

83.   Plaintiff Rosenberg undertook approximately 119 minimum fare trips, and due to   its actions, Uber reduced those fares on those trips by the amount of the Safe Rides Fees.

### Class Representative Jorge Zuniga

84.   Plaintiff Jorge Zuniga began working as an Uber driver on the UberX platform in July 2014, after the Safe Rides program began.

85.   Plaintiff Zuniga undertook approximately 130 minimum fare trips, and due to its actions, Uber reduced those fares on those trips by the amount of the Safe Rides Fees.

## CLASS ALLEGATIONS

### Definitions of the Main Class, the Declaratory and Injunctive Relief Class and the Issue Class

86.   All Plaintiffs represent and are members of a proposed **Main Class** asserting claims under Rule 23(b)(3) for Breach of Contract in Count I.

87.   The Main Class is defined as:

(A) all persons in the United States;

(B) who entered the 2013 Agreement, the June 2014 Agreement, the November 2014 Agreement, or a combination of those agreements (regardless of whether the person also later entered the December 2015 Agreement);

(C) and provided at least one minimum fare ride on the UberX platform for which a Safe Rides Fee applied before Uber changed its local fare webpages in November 2015 to state that minimum fares would include Safe Rides fees.

88.   Plaintiffs Congdon and Martinez represent, and are also members of, a **Declaratory and Injunctive Relief Class** asserting claims under Rule 23(b)(2) for final declaratory and injunctive relief in Count II.

89.   The Declaratory and Injunctive Relief Class is defined as:

(A) all persons in the United States;

(B) who entered the 2013 Agreement, the June 2014 Agreement, the November 2014 Agreement, the December 2015 Agreement, or a combination of those agreements if the Court does not find the arbitration provision in the last Uber driver contract the person executed was unenforceable; and

(C) did not opt-out of arbitration under the last Uber driver contract the person executed.

90.   Plaintiffs Congdon and Martinez represent, and are members of, a proposed, alternative Issue Class under Rule 23(c)(4) in Count III on behalf of any Main Class members otherwise subject to arbitration.

91.   The Issue Class is defined as:

(A) all persons who satisfy the definition of the Main Class if;

(B) the cumulative amount of Safe Rides Fees charged on the person's minimum fare rides—minus the Uber Service Fee rate in place at the time of those rides—totaled $666.65 or less during the Class Period;

(C) the person did not opt-out of arbitration under the last Uber driver contract the person executed; and

(D) The Court does not otherwise find the arbitration provision in the last Uber driver contract the person executed was unenforceable apart from the issues presented by this class.

92.   Excluded from each of the proposed classes are 1) the Defendants, 2) the Judge or Magistrate Judge to whom this case is assigned and the Judge or Magistrate Judge's immediate family, 3) persons who execute and file a timely request for exclusion from the class, 4) the legal representatives, successors, or assigns of any such excluded  person; and 5) Plaintiffs' counsel and Defendants' counsel.

93.   The defined "Class Period" applies to the Main Class and the Issue Class (Count I and Count III) and runs from (i) April 2014, when Uber began the Safe Rides program, until (ii) November 2015, when Uber changed its local fare webpages to state that riders would not pay the Safe Rides Fee on minimum fare rides.

94.   The Declaratory and Injunctive Relief Class (Count II) covers all drivers who meet the class definition for that proposed class and extends until the date of class certification.

95.   This suit seeks only damages, declaratory, and injunctive relief on behalf of the proposed classes, and it expressly is not intended to request any recovery for personal injury and claims related

thereto.

96.  **Numerosity**:  By December 2015, Uber had over 400,000 active drivers in the United States, so there are literally hundreds of thousands of members of the Main Class and the Declaratory and Injunctive Relief Class.  https://newsroom.uber.com/driver-partner-survey/.  The alternative Issue Class applies only to the extent that the Court otherwise finds the Main Class Members are required to arbitrate their claims; any such finding would logically apply on some uniform basis and, given the number of Main Class Members, almost certainly cover thousands of drivers.  So, while the exact size of each class is unknown and not available to the Plaintiffs at this time, it is clear that individual joinder is impracticable for the proposed classes.  The disposition of the class members' claims will provide substantial benefits both to the parties and to the Court in avoiding a multiplicity of identical suits.

*The Arbitration and Embedded Class Action Waivers Do Not Defeat Numerosity*

97.  Thousands of Main Class Members, including Plaintiffs Cowden, Rosenberg, and Zuniga, opted-out of arbitration, so those persons are not even *colorably* bound by any Uber mandatory arbitration provision nor the class action waiver contained within it.

98.  As detailed in a May 2015 Forbes magazine article titled "*The Numbers Behind Uber's Exploding Driver Force,*" http://www.forbes.com/sites/briansolomon/2015/05/01/the-numbers-behind-ubers-exploding-driver-force/#6fda4f0e4901, "[i]n a collaboration of Uber's Head of Research Jonathan Hall and Princeton University professor Alan Krueger, Uber surveyed 601 active U.S. drivers and analyzed the histories, schedules, and earnings of all drivers using the app since 2012."

99.  According to Uber's own data used in that survey, approximately 11% of its new drivers stop driving within a month, and nearly half are gone within a year. https://s3.amazonaws.com/uber-static/comms/PDF/Uber_Driver-Partners_Hall_Kreuger_2015.pdf.

100.  Given the number of Main Class Members (over 400,000) and the high turnover rate for Uber drivers, it is deductively evident that well over 10,000 Class Members ceased working for Uber without ever entering the December 2015 Agreement; so the enforceability issues alleged above regarding the 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement bar

application of the arbitration provisions in the last of those driver contracts such class members executed, as well as application of the class action waivers in those provisions.

101.   To the extent any class members are otherwise barred from pursuing or participating in a court proceeding, including a class action, due to the arbitration clauses in any of the driver contracts in this case, including the December 2015 Agreement, such a bar cannot properly apply to claims for less than the amount of the nonrecoverable filing fees they would be required to pay in arbitration because such application would deny such class members their *contractual* right to effectual relief. The majority of breach of contract claims for Main Class members and Issue Class members are for less than the sum of such nonrecoverable filing fees, and the precise number of such claims is information within the possession of Uber that can be produced in discovery.

102.   **Ascertainability:** The Main Class, Issue Class, and Declaratory and Injunctive Relief Class members are objectively ascertainable.  Uber maintains business records with respect to each of its drivers.  Based on these business records, it will be relatively straightforward to determine when the driver signed up as a driver with Uber or an Uber subsidiary, which Uber contracts the driver accepted, whether the driver opted out of arbitration, how much each driver earned in minimum fare rides, and how much Uber took from the drivers on those rides in the form of Safe Rides Fees. The class members can be identified and located through Uber's records, including the email addresses and phone numbers Uber used to communicate with class members.

103.   **Common Questions of Law or Fact (Main Class – Rule 23(b)(3))**; the claims of the Main Class present the following common questions of law or fact:

a)   Did Uber's email communications with drivers constitute part of the Class Members' contracts with Uber?

b)   Did Uber's webpages, including www.uber.com/cities, constitute part of the Class Members' contracts with Uber?

c)   Did Uber's Service Fee Schedules constitute part of the Class Members' contracts with Uber?

d)     Were drivers independent contractors who owned their fares charged to riders?

e)     Were payments from riders to Uber legally payments from the riders to the drivers?

f)     Were the fares that Uber published, legally, no more than default fares?

g)     Were drivers allowed to alter the default fares Uber set?

h)     Was Uber an independent service provider to the drivers, with no more right to the drivers' fares than that of any other such provider, i.e., only those rights spelled out by Uber's service contract with the drivers?

i)     Did Uber use the Safe Rides Fee to offset the cost of its "Safe Rides" program?

j)     Did the driver contracts permit Uber to take the Safe Rides Fees out of the Class Members' fares on minimum fare rides before Uber changed its local fare webpages by November 16, 2015?

k)     Did Uber take the Safe Rides Fees out of the Class Members' fares on minimum fare rides before Uber changed its local fare webpages by November 16, 2015?

104.   **Common Questions of Law or Fact (Declaratory and Injunctive Relief Class - Rule 23(b)(2) and Issue Class - 23(c)(4))**; except as noted, these class claims present the following, same common questions of law or fact:

a)     Do the contracts give the class members a substantive right to effectual relief for valid claims?

b)     What are the filing fees that class members must pay to arbitrate?

c)     What portion of the filing fees that class members must pay to arbitrate is non-recoverable for prevailing drivers asserting common law breach of contract claims?

d)     Do the non-recoverable filing fees that class members must pay to arbitrate render "ineffectual" the award to which drivers would be entitled if their claims are for less than those filing fees?

e)     Given the non-recoverable filing fees that class members must pay to arbitrate, the inability to join arbitration claims with other class members, and the bar on arbitration class actions, are the arbitration provisions unenforceable for claims that seek less than the non-recoverable filing fees

drivers must pay to arbitrate?

f)   Is the arbitration provision within the contracts unenforceable as a matter of contract because it denies drivers the effectual relief that the contracts promise?

g)   Is the arbitration provision within the contracts unconscionable and, thus, unenforceable because the contract both promises effectual relief in one provision while denying that relief in another provision?

h)   If the contract is enforceable, what is the appropriate injunctive relief to render claims effectual when those claims are for less than the nonrecoverable filing fees that Uber drivers would pay in individual arbitration?

i)   To remedy the chilling effect on common contract claims for less than the non-recoverable filing fees drivers must pay to arbitrate, should Uber be required to notify class members of any injunctive or declarative relief granted in this case regarding the non-recoverable filing fees drivers must pay to arbitrate?

j)   (Count II only)  Regardless of the substantive claims in this case, what is the appropriate final declaratory and injunctive relief for the Declaratory and Injunctive Relief Class members that will allow them effectual relief for any claims they have that are less than the non-recoverable filing fees they must pay to arbitrate?

k)   (Count II only)  Regardless of the substantive claims in this case, should the arbitration provision in the driver contracts at issue in this case (including the December 2015 Agreement) be found unenforceable for any claims drivers have that are less than the non-recoverable filing fees they must pay to arbitrate?

l)   (Count III only)  What is the appropriate preliminary injunctive relief for Issue Class members that will allow them effectual relief for claims they have that are less than the non-recoverable filing fees they must pay to arbitrate?

m)   (Count III only)  Should Uber be enjoined from enforcing the arbitration clauses in the driver contracts for claims drivers have that are for less than the non-recoverable filing fees they must

pay to arbitrate?

105.   **Typicality (Main Class)**: all of the Plaintiffs' claims are typical of the claims of other members of the Main Class, in that the Plaintiffs and the members of the class sustained damage arising out of Uber's uniform breach of its written contract with drivers and are entitled to breach of contract damages.

106.   **Typicality (Issue Class and Declaratory and Injunctive Relief Class)**:   The claims of Plaintiffs Congdon and Martinez are typical of the claims of other members of these classes, in that those Plaintiffs and the members of the classes are all subject to a contract entitling them to effectual relief; their breach of contract damages claims are for less than the non-recoverable filing fees they would have to pay in order to arbitrate those claims; the contracts purport to bar both arbitration class actions and the joinder of driver claims—thus denying class members any means of effectual relief, as their contracts promise.

107.   **Adequate Representation**: Plaintiffs Congdon, Cowden, Martinez, Rosenberg, and Zuniga will fairly and adequately represent and protect the interests of the proposed classes.  Plaintiffs have retained counsel competent and experienced in class actions and other complex litigation.  Plaintiffs have no interests antagonistic to those of the proposed classes, and Uber has no defenses unique to any of the Plaintiffs.

*Certification under Rule 23(b)(3) and Rule 23(c)(4)*

108.   **Predominance**: There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.  Those questions of law and fact common to the claims of the Plaintiffs and the Class predominate over any questions that may affect individual Class Members.   Common questions for the Main Class include, but are not necessarily limited to, those alleged above in paragraph 103.  Common questions for the Issue Class include, but are not necessarily limited to, those alleged above in paragraph 104. These common questions constitute a significant part of each individual's case and predominate over any individual determinations that could arise.

109.   The Plaintiffs and the Class members each used Uber to provide transportation services.

In doing so, they entered identical contracts with Uber. Based upon these identical contracts, the Class members are seeking relief against Uber for its uniform breach of its written contract with drivers.

110. There are no foreseeable difficulties likely to be encountered in the management of this action that would preclude its maintenance as a class action. As explained above, the Members of the Main Class, the Issue Class, and the Declaratory and Injunctive Relief Class are readily ascertainable by reference to Uber's own business records, including the number of minimum fare Rides they provided from which the Safe Rides Fee was taken. There are no difficulties of notice to class members, who can be readily ascertained from Uber's own business records. Any individualized damage calculations would be merely incidental to the common liability issues resulting from Uber's uniform practice of deducting the Safe Rides Fee from the fares drivers charge their riders on minimum fare rides. The list of common questions is exhaustive and so broad in scope as to cover every facet of this litigation (aside from the calculation of damages).

111. **Superiority**: This case is also appropriate for class certification as class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable.

112. The actual damages suffered by the vast majority of individual class members will be less than $650. Given the burden and expense required for individual prosecution of the litigation necessitated by Uber's actions, and the uniformity of the claims, it would be highly wasteful for class members to seek relief from Uber's contractual breaches on an individual basis.

113. Even if class members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint.

114. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

115. Plaintiffs Congdon and Martinez, on behalf of themselves and the Issue Class, also

alternatively request certification of an issue class for Count III pursuant to Rule 23(c)(4), which would be appropriate with respect to the issues detailed above in paragraph 104.

### *Certification under Rule 23(b)(2)*

116.   Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Uber has acted on grounds generally applicable to the Declaratory and Injunctive Relief Class, thereby making appropriate relief with respect to that class as a whole.   Given Uber's common treatment of the Declaratory and Injunctive Relief class, individual issues would not frustrate class relief and would not predominate over common issues.   The relief sought is appropriate and necessary to declare the known rights of drivers who are Plaintiffs and class members under the contracts in question, including their arbitration provisions; and, to prevent the continuing irreparable harm Plaintiffs have all suffered as a result of Uber's unlawful and wrongful conduct. Absent a class action, the class members will continue to face the potential for irreparable harm.   In addition, these violations of law will be allowed to proceed without remedy and Uber will likely continue such illegal conduct. Because of the size of the individual member's claims, few, if any, members could afford to seek legal redress for the wrongs complained of herein. A class action is a superior method for the fair and efficient adjudication of this controversy.

### COUNT I:

### Breach of Contract

117.   Plaintiffs reallege paragraphs 1-116 above.

118.   The 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement made clear that the Main Class members owned the fares that riders paid them and that Uber was simply an independent service provider helping to enable those drivers to provide transportation to their riders.

119.   For its independent service (like that of a CPA, a lawyer, a mechanic, or a plumber) Uber did not set fares (it merely suggested default fares) and had no contractual *ownership* rights in those customers' revenues (here, fares)—points Uber emphasized in its driver contracts.

120.   The Safe Rides Fee helped Uber cover its internal operating expenses for a program that

Uber used to promote itself in the two-sided marketplace in which it competes (i.e., with companies like Lyft—an Uber competitor that Main Class members often used as driver customers).

121.   As a service provider, Uber was contractually permitted to charge the Main Class member drivers a percentage-of-fare-based "Service Fee" and deduct that fee from the drivers' fares on which it was based.

122.   For drivers who had expenses that Uber advanced—specifically and only, "vehicle financing payments, lease payments, mobile device usage charges"—Uber was expressly permitted to deduct those driver-side expenses from drivers' fares. (Exhibit D, at 7).

123.   Extra charges on rides that had to be paid to governmental entities—like tolls and regional taxes—were contractually deemed charges in addition to the drivers' fares, and those charges were paid by riders and not part of the fare upon which Uber based its service fee.

124.   Although the Safe Rides Fee was actually additional revenue going to Uber to help cover its operating expenses, insofar as drivers were told, it was to be treated like surcharges collected to be paid to a governmental entity.

125.   Uber promised the Main Class members that the Safe Rides Fee would be paid by riders just like any other such surcharge—in addition to the fares that drivers charged riders.

126.   Inexplicably, and with no contractual basis for doing so, Uber took the Safe Rides Fees out of the Main Class members' fares on their minimum fare rides, thus reducing the sum the drivers received beyond the reduction that Uber was contractually permitted to take from drivers for Uber's services.

127.   During the Class Period, Uber breached the 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement by reducing the fares that drivers received on their minimum fare rides by the Safe Rides Fee amount on those rides.

128.   Plaintiffs and the other members of the Main Class are entitled to their damages from Uber's breaches of the 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement, calculated as the sum total of Safe Rides Fees taken out of their fares on minimum fare rides during the

Class Period, minus Uber's then-prevailing percentage charge to drivers on their fares.

## COUNT II

### Final Injunctive and Related Declaratory Relief – Rule 23(b)(2):

### *The Arbitration Clauses Are Unenforceable for Small Claims*

129. Plaintiffs Congdon and Martinez reallege paragraphs 1 to 116 on behalf of the proposed Declaratory and Injunctive Relief Class, and provisionally seek (i.e., if the Court otherwise finds them subject to the arbitration provision) the following final and Declaratory and Injunctive Relief:

130. Plaintiffs Congdon and Martinez challenge the enforceability of the arbitration clauses in all of the driver contracts at issue, including the December 2015 Agreement, for all claims of less than $666.66. However, because the arbitration provisions in the 2013 Agreement, the June 2014 Agreement, and the November 2014 agreement have each been previously determined to be unenforceable, the relief sought in Count II (and Count III below) in regard to individuals who signed these agreements but did not enter into the December 2015 Agreement, is conditioned on the contractual arbitration provisions in the 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement subsequently being deemed enforceable.

131. As a matter of <u>contract</u>, Uber chose to do the following in the December 2015 Agreement:

    a)   require drivers to split arbitration expenses with Uber to the extent those expenses are of the type drivers would incur in a court proceeding;

    b)   make the arbitration filing fees that drivers must split *unrecoverable*, even when drivers prevail;

    c)   prohibit class actions (which would have allowed drivers to spread their costs);

    d)   prohibit drivers from joining their claims (which would have allowed drivers to spread their costs);

    e)   give drivers a <u>substantive</u> right to *effectual* relief for claims;

    f)   require that all disputes over its class action waiver be litigated in court; and

g)  require that all class actions be litigated in court to the extent that the Class Action Waiver is unenforceable.

132.  Due to (i) the non-recoverability of arbitration costs, (ii) the bar on class actions in arbitration, (iii) the bar on joining driver claims in the same case, and (iv) the substantive right to effectual relief, the arbitration provision is unenforceable and unconscionable for all claims for sums less than the nonrecoverable costs of arbitration—currently, $666.66 for three party disputes and $500 for two party disputes.

133.  The Plaintiffs provisionally seek the following injunctive and declaratory relief:

a)  A declaration that the arbitration provision is unenforceable for all claims for sums less than the nonrecoverable costs of arbitration—currently, $666.66 for three party disputes and $500 for two party disputes;

b)  An injunction prohibiting Uber from forcing class members to arbitrate such claims;

c)  A declaration that such claims may be brought on a class action basis, provided that the requisites for class certification are otherwise met; and

d)  An injunction requiring Uber to notify all class members of this declaratory and injunctive relief.

## COUNT III (for Rule 23(c)(4) Issue Class Only):

### The Arbitration Clauses and Class Action Waivers Together Render Relief Ineffectual and Require that Uber be Enjoined from Arbitrating Driver Claims

137.  To the extent the claims alleged in Count I are otherwise subject to arbitration for any class members, Plaintiffs Congdon and Martinez reallege paragraphs 1 to 116 on behalf of a proposed Issue Class.

138.  As with Count II, the relief sought in Count III with respect to individuals who signed the 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement (in which the arbitration provisions have been previously determined to be unenforceable) but did not enter into the December 2015 Agreement, is conditioned on the contractual arbitration provisions in the 2013

Agreement, the June 2014 Agreement, and the November 2014 Agreement subsequently being deemed enforceable.

139. As a matter of <u>contract</u>, Uber chose to do the following in the December 2015 Agreement:

a) require drivers to split arbitration expenses with Uber to the extent those expenses are of the type drivers would incur in a court proceeding;

b) make the arbitration filing fees that drivers must split *unrecoverable*, even when drivers prevail;

c) prohibit class actions (which would have allowed drivers to spread their costs);

d) prohibit drivers from joining their claims (which would have allowed drivers to spread their costs);

e) give drivers a <u>substantive</u> right to *effectual* relief for claims;

f) require that all disputes over its class action waiver be litigated in court; and

g) require that all class actions be litigated in court to the extent that the Class Action Waiver is unenforceable.

140. The December 2015 Agreement (like the earlier contracts) grants drivers a substantive, contractual right to *effectual* awards for claims subject to the contract's arbitration clause—permitting drivers to obtain not only temporary but also "*preliminary* injunctive relief" from a court if the award they seek could "be rendered ineffectual" without such relief:

a) "A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief."

141. Due to (i) the non-recoverability of arbitration costs, (ii) the bar on class actions in arbitration, (iii) the bar on joining driver claims in the same case, and (iv) the substantive right to effectual relief, the arbitration provision is unenforceable and unconscionable for all claims by Issue Class

1    members.

2          142.   On behalf of themselves and the members of the Issue Class, Plaintiffs Congdon and

3    Martinez provisionally seek a determination of the following issues:

4          a)    Whether the class members are denied effectual relief if their claims are for less than the

5    nonrecoverable filing fee they would have to pay to arbitrate;

6          b)    What are the nonrecoverable filing fees that class members must pay to arbitrate;

7          c)    Whether the arbitration provision is unenforceable for all claims for sums less than the

8    nonrecoverable costs of arbitration;

9          d)    Whether a preliminary injunction should be issued prohibiting Uber from forcing Issue

10   Class members to arbitrate their substantive breach of contract claims;

11         e)    Whether such claims may be brought on a class action basis, provided that the requisites for

12   class certification are otherwise met; and

13         f)    Whether Uber should be required to notify all class members of the determination of these

14   issues.

15

16

17

18                                    **PRAYER FOR RELIEF**

19         WHEREFORE, Plaintiffs, individually and on behalf of the Class, request the following relief

20   against Uber:

21         143.   An order certifying this action to be a proper class action pursuant to Federal Rule of Civil

22   Procedure 23, establishing an appropriate Class and any Subclasses the Court deems appropriate, finding

23   that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms

24   representing Plaintiffs as counsel for the Class.

25         144.   An order awarding the Plaintiffs and the Class members actual damages arising from

26   Uber's breach of the contracts it entered into with each Class member.

27         145.   An order awarding the Plaintiffs and the Class members pre-judgment and post-judgment

28

633801.1 CLASS ACTION COMPLAINT                        34

interest on any monetary award.

146. An order awarding the Plaintiffs and the Class members reasonable attorneys' fees and costs as allowable by law.

147. An order awarding the Plaintiffs and the Class members injunctive and declaratory relief as may be appropriate under the terms of the contracts entered into by the Class members, including the declaratory and injunctive relief listed in paragraph 133 and 142.

148. Any other orders as may be necessary to prevent the practices at issue in this proceeding and to restore any interest or any money or property that may have been acquired by means of the violations set forth in this Complaint.

149. Any other relief the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

Dated: May 9, 2016                    Respectfully submitted,

_/s/ Andrew A. August_
Andrew A. August

| | |
|---|---|
| John G. Crabtree | Andrew A. August |
| Florida Bar No. 886270 | California Bar No.112851 |
| Charles M. Auslander | BROWNE GEORGE ROSS, LLP |
| Florida Bar No. 349747 | 101 California Street, Suite 1225 |
| George R. Baise Jr. | San Francisco, California 94111 |
| Florida Bar No. 0111805 | Telephone (415) 391-7100 |
| Brian Tackenberg | Fax (415) 391-7198 |
| Florida Bar No. 0107224 | aaugust@bgrfirm.com |
| CRABTREE & AUSLANDER, LLC | |
| 240 Crandon Boulevard, Suite 101 | Mark A. Morrison |
| Key Biscayne, Florida 33149 | California Bar No. 152561 |
| Telephone (305) 361-3770 | MORRISON AND ASSOCIATES |
| Fax (305) 437-8118 | 113 Cherry Street, Unit 34835 |
| jcrabtree@crabtreelaw.com | Seattle, Washington 98104 |
| causlander@crabtreelaw.com | Telephone (206) 317-3315 |
| gbaise@crabtreelaw.com | Fax (206) 397-0875 |
| btackenberg@crabtreelaw.com | Mark@mpaclassaction.com |
| floridaservice@crabtreelaw.com | |

1

2

3    *Counsel for Chuck Congdon, Ryan Cowden, Anthony Martinez, Jason Rosenberg, and Jorge Zuniga, individually and on behalf of all others similarly situated*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28