John G. Crabtree, *pro hac vice*
jcrabtree@crabtreelaw.com
Charles M. Auslander, *pro hac vice*
causlander@crabtreelaw.com
Brian C. Tackenberg, *pro hac vice*
btackenberg@crabtreelaw.com
CRABTREE & AUSLANDER
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Telephone (305) 361-3770 Fax: (305) 437-8118

Andrew A. August, SBN 112851
aaugust@bgrfirm.com
BROWNE GEORGE ROSS, LLP
101 California Street, Suite 1225
San Francisco, California 94111
Telephone (415) 391-7100 Fax (415) 391-7198

Counsel for Plaintiffs Chuck Congdon, *et al.*[1]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

Case No. 4:16-cv-02499-YGR

| | |
|---|---|
| CHUCK CONGDON, RYAN COWDEN, ANTHONY MARTINEZ, JASON ROSENBERG, and JORGE ZUNIGA, on behalf of themselves and all others similarly situated, | CLASS ACTION |
| | PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT |
| *Plaintiffs,* | |
| *vs.* | |
| UBER TECHNOLOGIES, INC., a Delaware corporation, RASIER, LLC, a Delaware corporation, and RASIER-CA, LLC, a Delaware corporation, | Date:   October 31, 2017<br>Time: 2:00 P.M.<br>Courtroom: 1<br>Judge: Hon. Yvonne Gonzalez Rogers |
| *Defendants.* | |

---

[1] A complete list of the parties represented is set forth on the signature page below.

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on October 31, 2017, or on such date as may be specified by the Court, in the courtroom of the Honorable Yvonne Gonzalez Rogers, United States District Court for the Northern District of California, 1301 Clay Street, Oakland, California, Courtroom 1, Plaintiffs Matthew Clark, Ryan Cowden, Dominicus Rooijackers, and Jason Rosenberg on behalf of themselves and the proposed class (the certification of which is the subject of a separate motion filed concurrently with this motion), will move for summary judgment pursuant to Rule 56 and the Court's Standing Order in Civil Cases on two claims: (1) the Plaintiffs' breach of contract claim and (2) the Plaintiffs' conversion claim.  This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Brian C. Tackenberg, and all exhibits thereto, the pleadings and papers on file in this action, and on such other written and oral argument as may be presented to the Court.

Dated: August 29, 2016                     Respectfully submitted,

/s/ John G. Crabtree
John G. Crabtree

John G. Crabtree                               Andrew A. August
Florida Bar No. 886270                      California Bar No.112851
Charles M. Auslander                         BROWNE GEORGE ROSS, LLP
Florida Bar No. 349747                      101 California Street, Suite 1225
Brian Tackenberg                             San Francisco, California 94111
Florida Bar No. 0107224                    Telephone (415) 391-7100
CRABTREE & AUSLANDER, LLC             Fax (415) 391-7198
240 Crandon Boulevard, Suite 101       aaugust@bgrfirm.com
Key Biscayne, Florida 33149
Telephone (305) 361-3770
Fax (305) 437-8118
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
btackenberg@crabtreelaw.com
floridaservice@crabtreelaw.com

Mark A. Morrison
California Bar No. 152561
MORRISON AND ASSOCIATES
113 Cherry Street, Unit 34835
Seattle, Washington 98104
Telephone (206) 317-3315
Fax (206) 397-0875
Mark@mpaclassaction.com


*Counsel for Plaintiffs Clark, Cowden, Rooijackers, and Rosenberg
individually and on behalf of all others similarly situated*

1

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ..........................................................................ii

STATEMENT OF THE ISSUES TO BE DECIDED.......................................................vii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................1

   I.     Introduction .........................................................................................................1

   II.    Statement of Facts................................................................................................2

ARGUMENT........................................................................................................................8

   A.  Summary Judgment on Breach of Contract Claim ............................................9

   B.  The Elements of a Breach of Contract Claim .................................................10

       1.  The Existence of a Contract .........................................................................11

       2.  Plaintiff's performance .................................................................................11

       3.  Defendants' breach ......................................................................................11

       4.  Damages........................................................................................................18

   C.  Summary Judgment on Conversion ................................................................18

   CONCLUSION ...................................................................................................18

   PROOF OF SERVICE.........................................................................................19

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION TO CERTIFY ISSUE CLASS
CASE NO. 3:16-cv-02499-YGR

# TABLE OF AUTHORITIES

**Case(s)** **Page(s)**

*Am. Safety Indem. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
759 F. Supp. 2d 1218 (S.D. Cal. 2011) ........................................................................10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................................................8

*Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*,
971 F.2d 272 (9th Cir.1992)..............................................................................................17

*Brobeck, Phleger & Harrison v. Telex Corp.*,
602 F.2d 866, 871 (9th Cir. 1979).................................................................................9, 10

*CDF Firefighters v. Maldonado*,
158 Cal. App. 4th 1226 (2008).........................................................................................10

*Fields v. Wise Media, LLC*,
C 12-05160 WHA, 2013 WL 3187414 (N.D. Cal. June 21, 2013) ...............................18

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) .........................................................................................10

*Duke v. Flying J, Inc.*,
178 F.Supp.3d 918 (N.D. Cal. 2016) ...............................................................................16

*Georgia-Pac. v. Officemax Inc.*,
12–cv–02797–WHO, 2013 WL 5273007 (N.D. Cal. 2013)........................................9, 10

*Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*,
523 F. Supp. 2d 1113 (C.D. Cal. 2007) ..........................................................................15

*John Hancock Ins. Co. v. Goss*,
14-cv-04651-WHO, 2015 WL 5569150 (N.D. Cal. 2015) ...............................................9

*Mazonas v. Nationstar Mortgage LLC*,
16-CV-00660-RS, 2016 WL 2344196 (N.D. Cal. May 4, 2016)......................................10

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000)...........................................................................................9

*Scribner v. Worldcom, Inc.*,
249 F.3d 902 (9th Cir. 2001)...........................................................................................16

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007)......................................................................................8

*Tanadgusix Corp. v. Huber*,
404 F.3d 1201 (9th Cir. 2005)....................................................................................9

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987)......................................................................................9

*United States v. Contra Costa County Water Dist.*,
678 F.2d 90 (9th Cir. 1982).........................................................................................9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF THE ISSUES TO BE DECIDED

Should summary judgment be granted in favor of the Plaintiffs on their claims for breach of contract and conversion?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   Introduction

The Plaintiffs in this case are Uber drivers (independent contractors, by the Defendants' own contention) who use Uber Technology Inc.'s mobile phone application to connect with individuals looking to contract for person-to-person transportation services ("Riders").   To use Uber Tech's application, the Drivers—depending on their location—contract with one of Uber Tech's wholly-owned subsidiaries (collectively, the "Rasier Entities" or "Rasier").[2]   The Raiser entities are service providers to the Drivers, who, in turn, are Rasier customers.

After connecting with a Rider through Uber's mobile phone application (the App) and providing transportation services to that Rider, the Riders pay the Drivers a fare for those services. The Drivers, in turn, pay Rasier a fixed percentage-of-fare "service fee" (on a per-transportation-service basis) as payment for Rasier's lead generation services.   Under their contracts with Rasier, the Drivers are independent contractors who set and own the "fares" that Riders pay them.   Rasier may thus only take a portion of the "fares" if it is contractually empowered by its customer, the Driver, to do so.    Rasier's percentage-based "service fee" is the prototypical example of such a contractually permissible charge.

In April 2014, Uber Tech implemented a fee called a Safe Rides Fee.   This fee was implemented to cover safety initiatives that were put in place by the company, and, thus, were paid to it—not the Drivers.   Uber informed the Drivers of just that, explaining that Riders would pay the Safe Rides Fee (not Drivers), and that the fee would be added as a separate charge on top of the "fare."

On *non*-minimum-fare rides, Uber implemented the Safe Rides Fee just as it explained it would: adding the fee on top of the "fare" as an additional charge to the Riders.   On minimum-fare rides,

---

[2] The Rasier defendants include Rasier-CA, LLC; Rasier-DC, LLC; Rasier, LLC; and Rasier-PA, LLC.   (Am. Compl. ¶ 25 (a)-(d)).

however, Uber implemented the Safe Rides Fee differently: instead of adding the fee on top of the "fare," Uber took an amount equal to the Safe Rides Fee out of the "fare"—which of course the Drivers legally "own."

The premise of this case is that Uber was not contractually entitled to take the money that it took out of the Driver-owned "fares" on minimum-fare rides. By doing so, Uber breached its contract with the Drivers and committed conversion.

## II.    Statement of the Facts

**Uber: Nature of the Business.** Uber[3] is not a transportation company. (Tackenberg Decl. Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1). It is a technology service company that created and administers a mobile phone application (the App). (*Id.* Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1, ¶¶ 1.12-1.13). The App enables the Riders to connect with the Drivers and contract for person-to-person transportation services. (*Id.* Ex. 1 at 1; Ex. 2 at 2; Ex. 3 at ¶¶ 1.12-1.13, 2.2-2.4).

**The Parties' Relationships to Each Other.** Each Rider is a contractual customer of Uber Tech. (Tackenberg Decl. Ex. 11). Uber Tech licenses its technology services, including its App, to Rasier. Each Driver is, by contract, a Rasier customer. (Tackenberg Decl. Ex. 1 at 1; Ex. 2 at 1; Ex. 3 at 1). The Drivers contracted with Rasier in order to use the App to connect and contract with potential Riders.[4] Such a market is called "two-sided" because Uber profits by connecting the primary parties to the underlying transaction (i.e., the independent-contractor Drivers and the Riders), and by supporting that underlying service. *See generally*

---

[3]    We will refer to the proposed class members as the "Drivers"; to Defendant Uber Technologies, Inc. as "Uber Tech"; to Uber Tech's Co-Defendant subsidiaries named in the Amended Complaint as "Rasier"; to the Defendants collectively as "Uber"; and to the Drivers' passengers as the "Riders."

[4]    There are thus three contractual arrangements: Driver-Rasier; Driver-Rider; and Rider-Uber Tech. (Tackenberg Decl. Ex. 1 at 1; Ex. 2 at 1-2; Ex. 3 at ¶ 2.3; Ex. 11).

http://lexicon.ft.com/Term?term=two_sided-markets (discussing other two-sided markets, which include newspapers and credit card companies).

**The Driver Contracts.**  The rights and obligations between the independent contractor Drivers and Uber are defined wholly by contract. The Driver contracts at issue (the 2013 Agreement, the June 2014 Agreement and the November 2014 Agreement, the last of which covers most of the class period) are largely the same substantively, but sometimes use different terminology to mean the same thing.  (Am. Compl. ¶¶ 29-33; Uber's Answer ¶¶ 29-33).   For example, the two earlier agreements use the term "Service Fee" to describe the sum that Riders pay the Drivers, but the same term refers to the sum that Drivers pay Rasier in the November 2014 Agreement. *Compare* (Tackenberg Decl. Ex. 1 at 4; Ex. 2 at 4) *with* (*Id.*  Ex. 3 ¶4.1).   Given the substantive similarity of the contracts (and the occasional inconsistency in terminology), the Plaintiffs will rely on the November 2014 Agreement unless otherwise indicated.[5]

**The Drivers Are Independent Contractors.**   By contract, the Drivers are not employees of Uber.  They are: (i) independent contractors (Am. Compl. ¶3; Uber's Answer ¶3; Tackenberg Decl.  Ex. 7 101:15-102:12); (ii) allowed to set the fares for their transportation services (Tackenberg Decl. Ex. 1 at 5; Ex. 2 at 5; Ex. 3 at ¶ 4.1); (iii) the owners of those fares; (*Id.* Ex. 1 at 1, 3, 4, 9; Ex. 2 at 2, 3, 9; Ex. 3 at ¶4.1; and (iv) deemed to receive the fares directly from the Riders. (*Id.* Ex. 1 at 1, 3, 4, 9; Ex. 2 at 2, 3, 9; Ex. 3 at ¶4.1). The transaction between Driver and Rider legally amounts to a direct business relationship between them.  (*Id.* Ex. 1 at 1; Ex. 2 at 2; Ex. 3 at ¶ 2.3).

---

[5] Copies of the three Agreements are attached to the Amended Complaint (Dkt. 49) as Exhibits B, C, and D.  The parties have stipulated that each of the contracts provided by the Plaintiffs are authentic and admissible.  (Dkt. 106, Stipulated Fact 1).

***How Uber Suggested Fares to the Drivers.*** Uber sent Service Fee Schedules to Drivers setting forth the "rates" used to calculate the *default* fares that Drivers could choose to charge Riders for transportation services (as noted above, the Drivers had the power to set the amount of the fare). (Tackenberg Decl. Ex. 6). With an exception for shorter rides, those suggested sums were, by contract, calculated by adding three different charges (a formula known as the "Fare Calculation"): (1) a base fare charge, (2) a per mile charge, and (3) a per minute charge. (Tackenberg Decl. Ex. 6; Ex. 3 ¶ 4.1). "Fare" and "base fare" were thus not synonymous: "Fare" included "base fare" plus two other addends ("mileage" and "time"). (Tackenberg Decl. Ex. 6; Ex. 3 ¶ 4.1). If the Fare Calculation yielded a sum less than a certain threshold sum (delineated as the "minimum fare") then the Drivers could choose to charge the alternative, minimum fare for that instance of transportation service instead of the fare as calculated pursuant to the default Fare Calculation (or some other fare). (Tackenberg Decl. Ex. 6; Ex. 3 ¶ 4.1). The Driver contracts with Rasier do not discuss minimum fares for transportation services, much less *distinguish* such fares from the other suggested fares.

Uber could change the calculation of the suggested fares, but was required to give notice to the Drivers of any such changes. Under the 2013 Agreement and the June 2014 Agreement, Uber could change the "rates" set forth in the Service Fee Schedules. (Tackenberg Decl. Ex. 1 at 4; Ex. 2 at 4). Under the November 2014 Agreement, Uber could change the "Fare Calculation" based on "local market factors." (*Id.* Ex. 3 ¶ 4.2).

***The Two Sums Rasier Could Take Out of Fares***. For its services (including the right to use the App), the Drivers were contractually required to pay Rasier a fee calculated as a fixed percentage of their fares. (Tackenberg Decl. Ex. 1 at 5; Ex. 2 at 5; Ex. 3 ¶4.4; Ex. 6). In addition, if the Driver had "separately agreed" to other deductions "(e.g., vehicle financing payments, lease

payments, mobile device usage charges, etc.)," Rasier could deduct those Driver-specific amounts from the fare. (*Id.* Ex. 3 ¶ 4.1).

**Ancillary Charges to Riders.** Beyond the fares for transportation services, ancillary expenses Drivers incurred for Riders—tolls, taxes, and regional fees—were handled discretely: they were added on top of the fares and remitted to Drivers to reimburse them. (*Id.* Ex. 3 at ¶ 4.1). Drivers did not pay a percentage to Rasier on such discrete sums. (*Id.* Ex. 6; Ex. 3 ¶ 4.4).

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████              █████████████
█████████████████████████████████████████████████████
██████████████

**Announcements of Uber Tech's Safe Rides Fee.** Beginning on April 18, 2014, Uber Tech announced a fee on *its* Rider customers called a "Safe Rides Fee" █████████████████
█████████████████████████████████████████████████████
████████████████████████████████ (Am. Compl. ¶¶ 5, 42); (Tackenberg Decl. Ex. 5); (Uber Answer ¶ 5, 42); (Tackenberg Decl. Ex. 7 at 43:8-13, 72:8-12, 98:9-10); Tackenberg Decl. Ex. 8 at 34:12-20). Uber emailed Rasier's Driver customers regarding the implementation of the fee. (Am. Compl. ¶42); (Tackenberg Decl. Ex. 5); (Uber's Answer ¶42).[6] Uber's email made clear that it would collect the SRF from Riders, not Drivers. (Am. Compl. ¶43); (Tackenberg Decl. Ex. 5); (Uber's Answer ¶ 43); (Tackenberg Decl. Ex. 7 at 123:5-8); (Tackenberg

---

[6] While other aspects of the April 18, 2014 email varied by market, the section of the email notifying drivers of the implementation of the SRF was uniform. (Tackenberg Decl. Ex. 7 127:13-128:20, 134:16-25).

Decl. Ex. 8 at 39:1-21). In its email, Uber also provided the following fare calculation example to illustrate how the SRF would be implemented:

|  | Old | New (ridesharing) |
|---|---|---|
| **Fare** | $10.00 | $10.00 |
| **Safe Rides Fee** | -- | $1.00 |
| **Total Rider Payment** | $10.00 | $11.00 |
| **Partner Earnings Description** | 80% of Fare | 80% of Fare |
| **Partner Earnings** | $8.00 | $8.00 |

(Tackenberg Decl. Ex. 5 at 2).[7]

In accordance with the email and its explanatory chart, the SRF was supposed to be an additional charge that Riders paid Uber Tech on top of the fares that Drivers charged the Riders for transportation services. (Tackenberg Decl. Ex. 10). The Drivers thus had no right to any SRFs that Uber Tech charged Riders above the fares, and Uber had no right to take the SRF out of any fares.  Consistent with that email, Uber's PMK confirmed under oath that the SRF was not part of the "base fare" within the Fare Calculation.  (Tackenberg Decl. Ex. 7 at 106:24-107:9). Nor, obviously, was it implemented as an aspect of "mileage" or "time." (Tackenberg Decl. Ex. 7. at 108:3-21).  So, logically, there was no space for it within the fares.

***Uber Recommends a Higher Minimum Fare.***  When it started the SRF program Uber also raised the sum it recommended that Drivers charge their Riders on minimum fare rides by the same amount as the SRF charge that *Uber Tech's* Rider customers were supposed to pay that company. (Tackenberg Decl. Ex. 8 47:11-13). The (independent contractor) Drivers still, of course, *owned* and, legally, had dominion over setting their fares.  Nonetheless, it seems Uber

---

[7] The parties agree that the email attached as Exhibit A to the Amended Complaint is authentic and admissible.  (Dkt. 106, Stip. Fact 1).

consciously took the SRF out of the Driver-owned fares on minimum fare rides—justifying doing so not on a legal basis, but on the visceral basis that the Drivers were not really worse off the day after the SRF began than they were the day before when they gave minimum fare rides (assuming that the Drivers used the new recommended fares).  (Tackenberg Decl. Ex. 9).  But the Drivers *were* worse off.   The Drivers owned and had the right to set their fares for transportation services—the fares were their own *property*—yet Uber was taking money out of those fares for Uber Tech's benefit.

  ***The Service Fee Schedules.*** Without distinguishing between minimum fare and non-minimum fare rides, the Service Fee Schedule that Rasier sent Drivers stated: "you agree to pay to the Company a fee [expressed as a percentage] of the total fare minus the $1.00 Safe Rides Fee." (Tackenberg Decl. Ex. 6).  The phrase "total fare" was not defined in the schedule (nor even *used* in the executed Driver contracts).  But based on the April 2014 email (which used the term "Total Rider Payment") and the rate schedules themselves, this term, "total fare," would seemingly mean something more than the Driver-owned (and set) fares for transportation services.  (Tackenberg Decl. Ex. 5). Nothing in the schedules said that Uber could take its SRF *out of* any Driver-owned fares. After all, the only charges permitted against those fares were, by contract, based on a percentage of the fare and any separately agreed Driver-specific charges—not some flat fee for Uber Tech's benefit.  And Uber had assured the Drivers in its April 2014 email that Riders would pay Uber's SRF, not the Drivers. (Tackenberg Decl. Ex. 5).

  On both minimum and non-minimum fare rides, Uber deducted a sum equal to the SRF from the total amount Riders paid.  On non-minimum fare rides, it is undisputed that Uber properly and discretely charged the SRF to its Rider customers as an *additional* sum above the fare that Drivers charged Riders for transportation services.  The new term "total fare" thus evidently meant the fare Drivers charged for transportation services plus the SRF that Uber charged.

There was no breach of contract for taking the SRF out of that sum.  But, on minimum fare rides, Uber took an amount equal to the SRF *out of* the fares Drivers charged Riders for transportation services rather than adding the SRF to the Driver-owned fare. (Tackenberg Decl. Ex. 7 114:13-21).

**Uber's Subsequent Change to its Website.**  On November 16, 2015, Uber amended its local fare webpages, which prospective riders and drivers use, to state that the minimum fare included the Safe Rides Fee.  (Am. Compl. ¶ 55); (Uber Answer ¶ 55). As the Plaintiffs explained in their response to the motion to dismiss, "such a change does not provide Uber the power to take part of the driver-owned fare." (Dkt. 75 at 5 n.5).

***Conversion Claim.*** The parties agree that Uber's liability under the conversion claim in this case rises and falls with the breach of contract claim.  (Dkt. 106 Stipulated Fact 4).

## ARGUMENT

A party may move for summary judgment on some or all of the claims or defenses presented in an action. FED. R. CIV. P. 56(a). Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the moving party will have the burden of proof at trial, that party "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984.  The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249–50. Further, the opposing party may not rest upon mere allegations or

denials of the adverse party's evidence, but instead must produce admissible evidence showing a genuine dispute of material fact exists. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### A. Summary Judgment on Breach of Contract Claim

Whether a contract is ambiguous is a question of law. *See United States v. Contra Costa County Water Dist.*, 678 F.2d 90, 91 (9th Cir. 1982). "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Tanadgusix Corp. v. Huber,* 404 F.3d 1201, 1205 (9th Cir. 2005) (internal quotations omitted).

The resolution of a breach of contract action should, if possible, begin and end with an analysis of the pertinent provisions in the contracts at issue. *See Georgia-Pac. v. Officemax In*c., 12–cv–02797–WHO, 2013 WL 5273007 at *6 (N.D. Cal. 2013) ("When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible."). Although, the court may look to extrinsic evidence in determining whether the contract is ambiguous, it cannot consider such evidence if "the language of the contract is not reasonably susceptible of interpretation and is unambiguous." *John Hancock Ins. Co. v. Goss*, 14-cv-04651-WHO, 2015 WL 5569150 (N.D. Cal. 2015) (internal citation omitted); *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979) ("If the court finds after considering this preliminary evidence that the language of the contract is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract.").[8] Moreover, to the extent that the contracts contain ambiguous terms, such ambiguities should be

---

[8] At the August 11, 2017 case management conference, the parties both stated that the contracts at issue are not ambiguous and, to the extent there is any ambiguity, the material facts are not in dispute.

1  resolved against the Defendants as they drafted the contracts at issue—a rule that applies with

2  particular force here, where the contracts are adhesion contracts. *Daniel v. Ford Motor Co.*, 806 F.3d

3  1217, 1224 (9th Cir. 2015).[9]

4      When undertaking such a contract interpretation, "[t]he whole of a contract is to be taken

5  together, so as to give effect to every part, if reasonably practicable, each clause helping to

6  interpret the other." *Georgia-Pac*, 2013 WL 5273007 at *6. In other words, the contract should be

7  interpreted "in a manner that makes the contract internally consistent." *Telex Corp.*, 602 F.2d at

8  872. If the "contractual language is clear and explicit and does not involve an absurdity, the

9  plain meaning governs." *Georgia-Pac.*, 2013 WL 5273007 at *6.

10  **B.  The Elements of a Breach of Contract Claim**

11      A breach of contract claim consists of four elements: "'(1) existence of the contract; (2)

12  plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to

13  plaintiff as a result of the breach.'" *Mazonas v. Nationstar Mortgage LLC*, 16-CV-00660-RS, 2016

14  WL 2344196, at *7 (N.D. Cal. May 4, 2016) (quoting *CDF Firefighters v. Maldonado*, 158 Cal. App.

15  4th 1226, 1239 (2008)). There are no disputed issues of material fact in this case regarding any of

16  the elements of breach of contract. Summary judgment is, thus, appropriate.

---

[9] Construing ambiguity against the drafter of a contract is appropriate at the summary judgment stage. *See Am. Safety Indem. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 759 F. Supp. 2d 1218, 1222–23 (S.D. Cal. 2011) ("A contract is to be construed as a whole, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. Applying that rule to the language at issue here results in a finding that there is an ambiguity in the contract over the duty to defend. Because 'doubts as to meaning must be resolved against the insurer[,]' the Court finds Defendant did have a duty to defend Signs & Pinnick under the policy.") (internal quotation omitted).

**1.  The Existence of a Contract**

The Drivers entered into the contracts at issue with Uber's wholly-owned Rasier subsidiaries.  The parties have stipulated that the copies attached to the complaint are authentic and admissible.  (Dkt. 106, Stip. Fact 1). There is no issue regarding the existence of the contracts.

**2.  Plaintiffs' Performance**

Uber Tech's Rasier Defendants were, by contract, service providers to the Drivers, and Uber Tech was a third-party beneficiary of the contract.  In exchange for Rasier's services, the Drivers were required to pay a contractually-defined service fee.  Since Rasier acted as the Drivers' payment collection agent and took the amount of money it determined it was entitled to (and more, for Uber Tech), Uber cannot plausibly assert that the Drivers failed to perform their contractual obligations to Rasier as a bar to the Drivers' claims in this case.

**3.  Defendants' Breach**

*i.     The Breach*

The breach of contract claim alleged is simple: Uber took an amount equal to the Safe Rides Fee out of the Drivers-owned fares on all minimum-fare rides (for Uber Tech's benefit) without the contractual right to do so.  There is no factual dispute that such a taking occurred on minimum fare rides.  Indeed, Uber's person with most knowledge admitted as much:

Q: Was the Safe Rides Fee imposed for minimum fares?

[Counsel for Uber]: Objection; vague.

A: The Safe Rides Fee was included within the minimum fare.

Q: When you say it was included within the minimum fare, so if the minimum fare was $3, in that $3 is the Safe Ride Fee?

A: Yes.

(Tackenberg Decl. Ex. 7 at 114:13-21).  Given that admission, the only real question is whether taking that money out of the Driver's fares was permissible under the governing contracts.

There are three contracts that govern the substantive claims in this case: the 2013 Agreement, the June 2014 Agreement, and the November 2014 Agreement.   Each of the agreements are, however, essentially identical regarding the substantive issues in this case. Accordingly, while we will point out any minor variations that exist between the contracts in an effort to ensure the analysis is complete, the superficial differences between the three operative agreements do not alter the underlying breach-of-contract analysis.

Under each contract, the Drivers charge each Rider a "fare" for each instance of completed transportation services, and—if the Driver and Rider do not agree to a different fare amount—the Driver-owned fare is calculated using a "base fare" amount plus mileage and/or time amounts.   (Tackenberg Decl. Ex. 1 at 4-5; Ex. 2 at 4-5; Ex. 3 ¶4.1); Ex. 6).[10]   That calculation is called the "Fare Calculation." (Tackenberg Decl. Ex. 3 ¶4.1).  By contract, the Drivers—independent contractors—own the fares and have the right to set them.  (*Id.* Ex. 1 at 1, 3, 4, 9; Ex. 2 at 1-3, 9; Ex. 3 a¶¶ 2.4, 4.1).

In a document called a "Service Fee Schedule," Uber sets forth the "rates" that are used to calculate the *recommended*, default fares for Drivers to charge their Rider customers. (*Id.* Ex. 6). If that Fare Calculation yields a sum less than a certain threshold sum (delineated as the "minimum fare") then the Drivers may choose to charge that sum as an alternative, minimum fare for that instance of transportation service instead of the fare as calculated pursuant to the default Fare Calculation (or some other fare, for that matter). (*Id.*).

Uber reserves the right to "change the Fare Calculation at any time in [Uber's] discretion based upon local market factors, and [Uber] will provide [drivers] with notice in the event of such

---

[10] As noted previously in this motion, the 2013 and June 2014 Agreements use the term "Service Fee" to describe the sum that Riders pay Drivers, while the November 2014 Agreement terms that sum the "Fare." *Compare* (Tackenberg Decl. Ex. 1 at 4; Ex. 2 at 4) *with* (*Id.* Ex. 3 ¶4.1).  That difference in nomenclature, although confusing, has no bearing on the analysis, and we will refer to the Rider-Driver charge as the fare.

change that would result in a change in the recommended Fare for each instance of completed Transportation Services." (*Id.* Ex. 3 at ¶ 4.2). Thus, Uber can change the three inputs that are in the "Fare Calculation," i.e., the base fare, the distance charge, or the time charge. *Id.*[11]

But that modification provision does not provide a contractual mechanism that would allow Uber to take an amount equal to the Safe Rides Fee out of the Drivers' fares, which they own and, as independent contractors, ultimately control. Uber has admitted that in calculating the fares it recommends, the Safe Rides Fee is not part of the "base fare" aspect of the calculation; nor, of course, could it be part of the mileage or time aspects of the calculation. (Tackenberg Decl. Ex 7 at 106:24-107:9, 108:3-21). The Safe Rides Fee was simply not part of the Fare Calculation, as that calculation was defined in the contract; nor could Uber unilaterally alter the Driver-*owned* fare through that provision in a way that would allow Uber to take part of the fare. (*Id.* at Ex. 1 at 4; Ex. 2 at 4; Ex. 3 ¶¶4.1, 4.4).[12]

The conclusion of the Plaintiffs' interpretation of the parties' contracts—that the Safe Rides Fee was not part of, and could not have been included within, the Driver-owned fare—is entirely consistent with the exemplar transaction that Uber provided to the Drivers in its April 18, 2014 email. The email's illustrated example showed that the Safe Rides Fee was to be a separate charge to Riders, above and independent from the fare. (Tackenberg Decl. Ex. 5 at 2). The

---

[11] The 2013 and June 2014 Contracts provide that Uber retained the right to change the "rates" that are set forth in the Service Fee Schedule and are used to calculate the recommended, default fares. (Tackenberg Decl. Ex. 1 at 4; Ex. 2 at 4). As with the November 2014 Agreement, which limited Uber's modification power solely to modifying the "Fare Calculation," Uber's modification power under its earlier contracts was, thus, similarly constrained to modifying the inputs involved in calculating the default fare.

[12] For the same reasons, the modification provision in the 2013 and June 2014 contract did not give Uber the contractual right to take an amount equal to the Safe Rides Fee out of the Driver-owned fares. While Uber had the power to change the default "rates" involved in calculating the Driver's default fares under the earlier provisions, that latitude did not give Uber the power to take any aspect of the Driver-owned Fares for the same reasons the November 2014 modification provision did not: Safe Rides Fee was simply not part of the fare calculation.

Drivers thus had no right to any Safe Rides Fees that Uber Tech charged Riders above the Driver-owned fares, and Uber had no right to take the Safe Rides Fees out of those fares.

There is simply no contractual provision that would allow Rasier to take the Safe Rides Fee out of the Driver-owned fares.   Nevertheless, on minimum fare rides, Uber took a sum equal to the fee *out of* the fare that the independent contractor Drivers charged their Riders for transportation services.  (Tackenberg Decl. Ex. 7 at 114:13-21).   Uber's conduct constitutes a breach of the parties' contracts.

Moreover, even if Uber's power to alter the default Fare Calculation actually could give Uber the right to take an aspect of the Drivers' fares equal to the Safe Rides Fee on minimum-fare rides (and it did *not*), Uber still would have failed to give sufficient notice (as required by the contract) for such a change to become effective.[13]  Uber's April 18, 2014 email stated clearly and explicitly that Riders would pay the Safe Rides Fee, not the Drivers.  (Am. Compl. ¶ 43); (Tackenberg Decl. Ex. 5.); (Uber's Answer ¶ 43); (Tackenberg Decl. Ex. 7 at 123:5-8); (Tackenberg Decl. Ex. 8 at 39:1-21).  Thus, if Uber intended for the *Drivers* to pay the Safe Rides Fee out of the fares they owned, then Uber's email utterly failed to make that intention clear, and would not have satisfied Uber's contractual notice requirement.

ii.      *Uber's Anticipated Arguments*

Uber has indicated it intends to argue that by raising the suggested minimum fare by the amount of the Safe Rides Fee, Uber became entitled to take an amount equal to the Safe Rides Fee out of the Drivers' minimum fares.   That argument misconstrues the parties' legal relationship.  Neither Uber Tech nor Rasier had a *plenary* right to reach into, and extract, any of the transportation charges that Drivers are paid by Riders.  The Drivers were, after all, independent

---

[13] The 2013 Agreement, which was in place when the Safe Rides Fee was instituted, stated that before any change to the rates set forth in the Service Fee Schedule could become effective, Uber was required to "provide notice of such change(s) to [the drivers] via email, [the drivers'] mobile application or other written means."  (Tackenberg Decl. Ex. 1 at 4).

contractors, not Uber's employees.  And under the Rasier Driver contract, the Drivers *owned* the fares they charged Riders for transportation services; indeed, they had the right to set the fares and were deemed to receive them directly from the Riders.  So neither Rasier (nor Uber Tech) had any right to any portion of those fares—other than that which Drivers granted by contract.  The fact that Uber increased the sum of the default fare it recommended Drivers charge does not change the fact that the Drivers *owned* those fares and had the right to set them.

Additionally, Uber has indicated it will rely on the language in its Service Fee Schedule that says the Drivers "agree to pay to the Company a fee for each Request accepted, in the amount of 20% for uberX . . . of the total fare minus the $1 Safe Rides Fee . . . ."  (Tackenberg Decl. Ex. 6).  But that language is unavailing for several reasons.

*First*, it is premised on a "total fare" that has no defined meaning, and thus cannot overcome the explicit definition of fare included in the contract (and which the Drivers own). The term "total fare" does not appear anywhere in the parties' contracts.  Based upon the context in which it is used, however, it should most logically be interpreted to mean the fare that the Rider paid for transportation services, plus the additional dollar Uber added for the Safe Rides Fee. That meaning is consistent with Uber's April 18, 2014 email since the Safe Rides Fee (as it is illustrated in that email) is not part of the driver-owned "fare," and would, thus, need to be subtracted from the Rider's total payment before calculating Uber's percentage-of-fare service fee (which is, of course, calculated based on the fare that is paid from the Rider to the Driver).[14]  To read "total fare" to mean the same thing as the fare Drivers charge Riders would be inconsistent with that term's contractual definition: "Fare is calculated based upon a base fare amount plus mileage and/or time amounts, as detailed for the applicable Territory."  (Tackenberg Decl. Ex. 3 at ¶ 4.1). *See Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1126 (C.D.

---

[14]  The email uses the term "total rider payment" to mean the fare plus the Safe Rides Fee.

Cal. 2007) (noting that contracts should be interpreted so as to give effect to each part and not in a way that would render any part meaningless).

Thus, total fare is not the same thing as the contractually-defined, driver-owned fare, and the language from the service fee schedule does not overcome the explicit contractual definition that applies to "fare."  Once the dichotomy between "total fare" and "fare" (as that term is defined in the contract) is made clear, Uber's argument based on loose language in its Service Fee Schedules unravels.  Indeed, even that language provides Uber with no right that it does not already have under the plain terms of the contract, i.e., Uber may charge a fee directly to Riders, but Uber cannot take any aspect of the Driver-owned fare without explicit contractual authority.[15]

*Second*, the language in the schedule that Uber relies on simply defines which portion of the so-called "total fare" would be subjected to Rasier's percentage-based service charge.  It certainly does not state that Uber has the right to take SRFs out of the Drivers' fares.  Uber may argue that the language *suggests* such a deduction from the "total fare" but we know that the "total fare" is not the fare that Drivers charge riders for transportation services—a concept well ensconced in the contract, Uber emails, and even in the schedules themselves, which explicitly refer to "fares" (including "minimum" fares) without suggesting that either is the same as the "total fare."  *See Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001) (even where a party to contract retains discretion to interpret contract terms that "does not provide a blank check for that party to define terms however it chooses."); *Duke v. Flying J, Inc.*, 178 F.Supp.3d 918, 925 (N.D. Cal. 2016) ("fundamental goal of contract interpretation . . . is to give effect to the mutual intention of the parties as it existed at the time they entered the contract.")  Boiled down, *nothing* in the schedule

overcomes the more specific language in the contract that the Drivers (i) are independent contractors; (ii) who legally set the fares for transportation services; (iii) *own* their fares; and (iv) are deemed to be paid those Driver-owned fares directly by the Riders.  *See Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir.1992), ("It is well settled that [w]here there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.") (internal citation omitted).

*Third*, and quite tellingly, Uber did not take the SRF out of the fares on any non-minimum fare rides.  Uber only took the SRF out of the fares charged on minimum fares rides.  The contract (even the schedules) say nothing to suggest that Drivers somehow own their fares on short rides any *less* than they own their fares on longer rides.

*Fourth*, the fares (minimum and non-minimum) were never all-inclusive charges for Riders: Riders were always, by contract, subject to additional charge for tolls, taxes and regional fees.

*Fifth*, even the minimum fares that Uber suggested were, of course, still only default sums for Drivers to use; the Drivers were always legally free to use the Fare Calculation (or any other sum) that was less than the suggested minimum fares.  So what would happen if a Driver gave a Rider a ride down the block and charged only $1 for the transportation fare, even though the suggested minimum fare was $5?  The contracts say that Rasier's percentage-based service charge is calculated using the default fares regardless of what the Driver actually charges, so the Driver would owe Rasier the full $1.  Fair enough.  But how would the SRF function if it is not added to the fare?  The April 2014 email said that *Riders* always paid the SRF, but in the hypothetical—if Uber's argument held water that it could take the SRFs out of minimum fares—there would be no money for the SRF.  After all there is no clause in any contract permitting Uber to make *Drivers* pay the SRF out of their fares or, even worse, out of the Driver's own pocket; that's why, as promised in the April 2014 email, Uber added the SRF to all fares---all fares, that is, other than

minimum fares.  Under Uber's litigation theory, however, the SRF could not get paid on this hypothesized $1 minimum fare ride.

### 4. Damages

The final element of a breach of contract claim is the existence of damages. The Drivers' were entitled to the full amount of their fares, regardless of the amount, minus only Uber's contractual service fee and any separately agreed Driver-specific amount, such as for vehicle financing and cell phone charges. Uber did not have the power to take any other money out of the Drivers' fares.  Uber's decision to take an amount equal to the Safe Rides Fee out of the Drivers' fares on minimum fare rides without permission from the Drivers to do so (i.e., Uber's breach) directly decreased the Drivers' fares.  By doing so, Uber financially harmed each of the Drivers on each minimum fare ride. There is no genuine issue of material fact regarding the existence of damages.

### C. Summary Judgment on Conversion

"[A] plaintiff must plead three elements to state a claim for conversion: (1) ownership or right to possession of personal property; (2) a defendant's wrongful interference with the claimant's possession; and (3) damage to the claimant." *Fields v. Wise Media, LLC*, C 12-05160 WHA, 2013 WL 3187414, at *7 (N.D. Cal. June 21, 2013). In light of the similarity between the Plaintiffs' conversion and breach of contract claims, the parties have stipulated that Uber's liability for the conversion claim should rise and fall with the breach of contract claim. (Dkt. 106 Stipulated Fact 4).

### CONCLUSION

The Court should enter an order granting the Plaintiffs' motion for summary judgment.

Dated: August 29, 2017                     Respectfully submitted,

                                           /s/ John G. Crabtree
                                           John G. Crabtree

1

2

John G. Crabtree
Florida Bar No. 886270
Charles M. Auslander
Florida Bar No. 349747
George R. Baise Jr.
Florida Bar No. 0111805
Brian Tackenberg
Florida Bar No. 0107224
CRABTREE & AUSLANDER, LLC
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Telephone (305) 361-3770
Fax (305) 437-8118
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
gbaise@crabtreelaw.com
btackenberg@crabtreelaw.com
floridaservice@crabtreelaw.com

Andrew A. August
California Bar No.112851
BROWNE GEORGE ROSS, LLP
101 California Street, Suite 1225
San Francisco, California 94111
Telephone (415) 391-7100
Fax (415) 391-7198
aaugust@bgrfirm.com

Mark A. Morrison
California Bar No. 152561
MORRISON AND ASSOCIATES
113 Cherry Street, Unit 34835
Seattle, Washington 98104
Telephone (206) 317-3315
Fax (206) 397-0875
Mark@mpaclassaction.com

*Counsel for Plaintiffs Clark, Cowden, Rooijackers, and Rosenberg,*
*individually and on behalf of all others similarly situated*

**PROOF OF SERVICE**

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on

August 29, 2017 and served by the same means on all counsel of record.

/s/ John G. Crabtree

John G. Crabtree