WILLIAM L. STERN (CA SBN 96105)
WStern@mofo.com
CLAUDIA M. VETESI (CA SBN 233485)
CVetesi@mofo.com
ALEXANDRA E. LAKS (CA SBN 291861)
ALaks@mofo.com
LUCIA X. ROIBAL (CA SBN 306721)
LRoibal@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:      415.268.70001
Facsimile:      415.268.7522

ARIEL F. RUIZ (CA SBN 305488)
Ariel.Ruiz@uber.com
UBER TECHNOLOGIES, INC.
1455 Market Street
San Francisco, California 94103
Telephone: 415.391.4800

Attorneys for Defendants
UBER TECHNOLOGIES, INC., RASIER, LLC, RASIER-CA,
LLC, RASIER-DC, LLC, AND RASIER-PA, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CHUCK CONGDON, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>　　　　　Defendants. | Case No.      4:16-cv-02499-YGR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing Date:   October 31, 2017<br>Time:              2:00 P.M.<br>Courtroom:       1 (4th Floor)<br>Judge:            Yvonne Gonzalez Rogers<br><br>Action Filed:    May 9, 2016 |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, on October 31, 2017, at 2:00 p.m. or as soon thereafter as the matter may be heard in Courtroom 1 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, in Courtroom 1 before the Honorable Yvonne Gonzalez Rogers, Defendants Uber Technologies, Inc., Rasier, LLC, Rasier-CA, LLC, Rasier-DC, LLC, and Rasier-PA, LLC (collectively "Uber" or "Defendants") will, and hereby do, move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Court's Standing Order in Civil Cases on Plaintiffs Matthew Clark, Ryan Cowden, Dominicus Rooijackers, and Jason Rosenberg's claims for breach of contract and conversion.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of William L. Stern and all exhibits thereto, the Declaration of Rosemary Barajas and all exhibits thereto, and on such other written and oral argument as may be presented to the Court.

Dated: September 19, 2017                    UBER TECHNOLOGIES, INC.

WILLIAM L. STERN
CLAUDIA M. VETESI
ALEXANDRA LAKS
LUCIA X. ROIBAL
MORRISON & FOERSTER LLP


By:   /s/ William L. Stern
         WILLIAM L. STERN

Attorneys for Defendants
UBER TECHNOLOGIES, INC.,
RASIER, LLC, RASIER-CA, LLC, RASIER-DC,
LLC, AND RASIER-PA, LLC

### STATEMENT OF THE ISSUES TO BE DECIDED

Plaintiffs' motion for summary judgment raises the following issues:

1.      Plaintiffs allege that when Uber implemented a one dollar Safe Rides Fee in April 2014, it took the Safe Rides Fee charges out of the drivers' fares on minimum fare rides.  Should the Court enter summary judgment for Plaintiffs because there is no evidence supporting the allegation that the Safe Rides Fee was taken out of drivers' earnings on minimum fare rides?

2.      Should the Court enter summary judgment for Plaintiffs if the driver agreements are not susceptible to Plaintiffs' interpretation that the one-dollar increase to the total fare on minimum fare rides is part of the Fare on which driver earnings are computed?

Uber's cross-motion for summary judgment raises the following issue:

3.      If the answer to Issue #1 or #2 (or either of them) is no, should the Court grant Uber's cross-motion for summary judgment given there are no material issues of disputed fact?

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................ i

STATEMENT OF THE ISSUES TO BE DECIDED ..................................................... ii

TABLE OF AUTHORITIES ....................................................................................... v

I.      INTRODUCTION ........................................................................................... 1

II.     THE UNDISPUTED FACTS ........................................................................... 2

    A.   The Driver Agreements ......................................................................... 2

    B.   The Four Named Plaintiffs .................................................................... 2

    C.   How Drivers' Earnings Are Calculated—Regular Fares. ......................... 3

        1.   Driver Earnings Are Calculated as Fare—Capital F—Times 80%. ........... 3

        2.   The Service Fee Schedules ............................................................. 4

        3.   Driver Earnings on "Minimum Fare" Trips. ..................................... 5

    D.   Changes to Fare Calculation. ................................................................ 5

    E.   The Safe Rides Fee ............................................................................... 5

        1.   The April 2014 Email ..................................................................... 5

        2.   The Change to the Service Fee Schedules. ...................................... 6

    F.   The "Continued Use" Clause. ................................................................ 7

    G.   The SRF in Minimum Fare Rides: Receipts Demonstrate Fare Breakdowns for Before and After the SRF. ........................................... 7

    H.   Plaintiffs' Post-SRF Correspondence Confirms They Understand Post-SRF Earning Calculations. ............................................................ 9

    I.   Plaintiffs' Weekly Statements and Form 1099Ks Confirm They Understand the SRF Is Not Included in Their Earnings. ......................... 10

    J.   Plaintiffs' Deposition Testimony Impeaches the Amended Complaint. ............... 11

III.    LEGAL STANDARD ..................................................................................... 11

IV.     THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT FOR THREE REASONS ......................................... 11

    A.   Reason No. 1—Uber Never "Took" the SRF "Out of" Driver Earnings. ............. 12

        1.   Myth No. 1—Uber Never Took The SRF "Out Of" Driver Earnings. ......................................................................... 12

        2.   Myth No. 2—Minimum Fare Rides and Regular Rides Are Not Treated Differently. ........................................................... 15

    B.   Reason No. 2—There Was No Breach of Contract. ............................... 16

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

iii

|  |  | 1. | The Rules of Construction. | 17 |
|  |  | 2. | The Contracts Don't Say What Plaintiffs Claim. | 17 |
|  |  | 3. | Plaintiffs' Interpretation Is At Odds With The Extrinsic Evidence | 18 |
|  | C. | | Reason No. 3—The Court Could Deny Summary Judgment On An Alternative Ground, Paragraph 4.2. | 20 |
| V. | | | THE COURT SHOULD GRANT UBER'S CROSS-MOTION FOR SUMMARY JUDGMENT | 21 |
|  | A. | | There Are No Disputed Fact Issues. | 21 |
|  | B. | | The Court Should Enter Judgment for Defendants. | 21 |
| VI. | | | CONCLUSION | 22 |

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................................................11

*Baldwin v. AAA N. Cal., Nev. & Utah Ins. Exch.*,
    1 Cal. App. 5th 545, 555 (2016), *as modified* (July 13, 2016).........................................14 n.15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................................................11

*Citi Apts., Inc. v. Markel Ins. Co.*, Nos. C 06-5752 CW, C 06-7086 CW,
    2007 WL 1689013 (N.D. Cal. June 11, 2007) ...........................................................................21

*Dore v. Arnold Worldwide, Inc.*,
    39 Cal. 4th 384 (2006) ..............................................................................................................17

*Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*,
    249 F.3d 1132 (9th Cir. 2001).....................................................................................................21

*Gen. Bus Sys. v. N. Am. Philips Corp.*,
    699 F.2d 965 (9th Cir. 1983).......................................................................................................12

*Grebow v. Mercury Ins. Co.*,
    241 Cal. App. 4th 564 (2015), *as modified on denial of reh'g* (Oct. 26, 2015)...............14 n.15

*Int'l Inc. Co. of Hannover v. ACW Constr., Inc.*,
    No. 15-cv-00544-YGR, 2015 WL 6954962 (N.D. Cal. Nov. 10, 2015)......................................17

*Jade Fashion & Co. v. Harkham Indus., Inc.*,
    229 Cal. App. 4th 635 (2014)......................................................................................................18

*Legacy Vulcan Corp. v. Super. Ct.*,
    185 Cal. App. 4th 677 (2010)...............................................................................................16, 17

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006)......................................................................................................17

*McKee v. State Farm Fire & Cas. Co.*,
    145 Cal. App. 3d 772 (1983)..............................................................................................18 n.21

*Nelson v. Pima Cmty. Coll.*,
    83 F.3d 1075 (9th Cir. 1996)......................................................................................................12

*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
    69 Cal. 2d 33 (1968) ..................................................................................................................18

*Parsons v. Bristol Dev. Co.*,
    62 Cal. 2d 861 (1965) ................................................................................................................21

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

v

*Riverside Sheriffs' Ass'n v. Cty. of Riverside*,
 173 Cal. App. 4th 1410 (2009)..................................................................................................17

*Rosen v. State Farm Gen. Ins. Co.*,
 30 Cal. 4th 1070 (2003) ..................................................................................................14 n.15

*S. Cal. Counseling Ctr. v. Great Am. Ins. Co.*,
 162 F. Supp. 3d 1045 (C.D. Cal. 2014)..........................................................................14 n.15

*Soremekun v. Thrifty Payless, Inc.*,
 509 F.3d 978 (9th Cir. 2007)....................................................................................................11

*TRB Invs., Inc. v. Fireman's Fund Ins. Co.*,
 40 Cal. 4th 19 (2006) ...............................................................................................................17

*Ward v. Apple Inc.*,
 No. 12-cv-05404-YGR, 2017 WL 1075049 (N.D. Cal. Mar. 22, 2017)....................................11

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
 10 Cal. App. 5th 56, 69 (2017)..................................................................................................18

*Wolf v. Walt Disney Pictures & Television*,
 162 Cal. App. 4th 1107 (2008)..................................................................................................21

**Statutes**

Cal. Civ. Code
 § 1636...........................................................................................................................................17
 § 1638...........................................................................................................................................17
 § 1639.....................................................................................................................................14, 17

**Rules**

Fed. R. Civ. P.
 56(a) ...........................................................................................................................................11

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

vi

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs are four independent third-party transportation providers ("drivers") who used Uber's mobile application to receive transportation requests from riders.  Suing on behalf of a putative class of 9,602 drivers who opted out of arbitration, Plaintiffs allege that when Uber implemented a $1 Safe Rides Fee ("SRF") in April 2014, it "took the Safe Rides Fee charges out of the drivers' fares whenever drivers charged riders minimum fares."  They sue for breach of contract and conversion, and seek 80¢ of each additional $1 on minimum fare rides.

There are two fundamental problems with Plaintiffs' theory.  The first is factual.  The second is legal.  Either one is fatal.

First, factually, it never happened.  Uber's email told drivers the SRF "will not affect your earnings"—and it didn't.  Uber *added* a one dollar SRF to the amount collected from riders.  Thus, after the SRF, drivers earned exactly the same as before.

Second, there was no breach of contract.  Plaintiffs mistakenly believe that drivers "own" 80% of whatever amount appears on the App at the end of a trip.  The agreements say no such thing.  What drivers own is 80% of the Fare—capital F—which is defined as base fare + mileage + time.  The SRF is none of these.  It is a special fee *in addition to* the Fare.  The Service Fee Schedules, which are part of the contracts, confirm drivers have no claim to the SRF:  "[Y]ou agree to pay to the Company [80%] of the total fare ***minus the $1 Safe Rides Fee***."

Plaintiffs' theory is not only repugnant to the agreements, it is inconsistent with Uber's email to drivers, which says the SRF would be ***deducted*** before calculating drivers' earnings.  It is also inconsistent with the rider receipts, the drivers' Weekly Statements, and the Form 1099Ks, all of which show the SRF as a ***subtraction*** from the total fare before calculating driver earnings.  Finally, in deposition, all four Plaintiffs impeached the theory of the Amended Complaint.

The Court should deny Plaintiffs' motion for summary judgment.[1]  Instead, given the undisputed facts, it should grant Uber's cross-motion for summary judgment.

---

[1] The conversion claim is derivative of the contract claim; they rise and fall together. (Amended Joint Stipulation of Undisputed Facts # 4 ("JSUF") (ECF No. 106) at 1:18-19.)

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

1

## II.   THE UNDISPUTED FACTS

### A.   The Driver Agreements.

There are four "driver" agreements, all admissible.  (JSUF #1.)  The four Agreements are as follows:

| __Agreement__ | __Amended Complaint__ |
|---|---|
| 2013 Transportation Services Agreement ("2013 Agreement") | Exhibit B |
| June 2014 Raiser Software Sublicense & Online Services Agreement ("June 2014 Agreement") | Exhibit C |
| November 2014 Software License & Online Services Agreement ("November 2014 Agreement") | Exhibit D |
| 2015 Technology Services Agreement ("December 2015 Agreement") | Exhibit E |

Plaintiffs argue, and Uber agrees, that the contracts include essentially "the same governing provisions."  (Pls.' Not. of Mot. and Mot. for Sum. J. ("Mot.") (ECF No. 109), 12:1-7 (noting that the agreements are "essentially identical regarding the substantive issues in the case" and that, although "minor variations exist between the contracts . . . the superficial differences between the [] operative agreements do not alter the underlying breach-of-contract analysis.").)

The 2013 Agreement controls.  It was in effect when the SRF was implemented, though the result is the same regardless of which Agreement controls.  (Am. Compl. (ECF No. 49) ¶ 42.) Plaintiffs admit all the Agreements are "clear" and unambiguous.  (*Id.*, ¶ 9; *see also* Mot. 9 n.8.)

### B.   The Four Named Plaintiffs.

Plaintiffs Matthew Clark, Ryan Cowden, Dominicus Rooijackers, and Jason Rosenberg are four drivers who utilized the Uber App to receive transportation requests from riders.  Each activated his Uber account and signed one or more of the driver agreements as follows:

- **Clark.**  Mr. Clark activated his Uber driver account on March 5, 2014, and entered into the 2013 Agreement in March 2014.  He subsequently signed the June 2014 Agreement, November 2014 Agreement, and the December 2015 Agreement.  (*See* Pls.' Supp. Separate Statement ("Supp. Statement") (ECF No. 107), 2:19-28.)

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

2

- **Cowden.** Mr. Cowden activated his Uber driver account on August 18, 2015, and entered into the November 2014 Agreement in August 2015. He subsequently entered into the December 2015 Agreement. (*Id.* at 3:3-12.)
- **Rooijackers.** Mr. Rooijackers activated his driver account on December 31, 2014, and entered into the November 2014 Agreement on January 15, 2015. He subsequently entered into the December 2015 Agreement. (*Id.* at 3:12-22.)
- **Rosenberg.** Mr. Rosenberg activated his driver account on October 4, 2013, and entered into the 2013 Agreement. He subsequently entered into the June 2014 Agreement. (*Id.* at 3:22-28.)

**C.     How Drivers' Earnings Are Calculated—Regular Fares.**

Plaintiffs allege that the terminology in the Agreements concerning driver compensation changed (especially from the June 2014 Agreement to the November 2014 Agreement), but the formula largely stayed the same. (Am. Compl. ¶¶ 30-33, 35-41; Mot. 12:1-7.) This is how it works.

**1.     Driver Earnings Are Calculated as Fare—Capital F—Times 80%.**

Plaintiffs admit that the capital-F "Fare" a driver earns is based on the "Fare Calculation" as defined in the driver agreements. (¶ 4.1.)[2] The Fare is comprised of the base fare plus mileage and/or time amounts ("BF+M+T"), which vary by locality as set forth on Uber's website at www.uber.com/cities. (*Id.*; *see also* Mot. 12:10-12.) In arithmetic parlance, the Fare is the multiplicand. The multiplier is the driver's percentage of the Fare, usually 80%.[3] Thus, what drivers earn is the product of the multiplier (80%) times the multiplicand (Fare), or 80% x Fare.

As noted, the language differed, but these are the agreements' key earnings provisions:

_____

[2] In their motion, Plaintiffs use the November 2014 Agreement as illustrative, and so will Uber. Unless otherwise stated, all paragraph citations refer to the November 2014 Agreement. The 2013 Agreement and June 2014 Agreement do not reference the "Fare," but instead refer drivers to the Service Fee Schedule, which sets forth the same calculation base fare + mileage + time calculation. (*See* Am. Compl., Ex. F (ECF No. 49-6).)

[3] The agreements provide that Uber takes 20% (or a higher or lower percentage that varied over time and geography) of the Fare as a Service Fee for Uber's provision of the Uber App and Uber Services. (¶ 4.4.) The 2013 and June 2014 referred to the "Service Fee" as the sum that drivers received: i.e. 80% of the Fare. The parties agree that this different nomenclature does not affect the analysis. (*See* Mot. 12:26-28 n.10.)

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

3

| **Agreement** | **Compensation formula** |
|---|---|
| 2013 Agreement | The driver "shall be paid a Service Fee at the pre-arranged rates for each Request performed, which shall be forth in a Service Fee Schedule." |
| June 2014 Agreement | [Same as June 2013 Agreement] |
| November 2014 Agreement | "Fare is calculated based upon a base fare amount plus mileage and/or time amounts, as detailed for the applicable Territory[.]" |
| December 2015 Agreement | "You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("Fare"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Company using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("Fare Calculation").[4] |

## 2. The Service Fee Schedules.

The specific base fare, mileage, and time rates vary by territory, and are set forth in the Service Fee Schedules (*see, e.g.*, Am. Compl., Ex. F (ECF No. 49-6))[5] and are part of the contract.  (Am. Compl. ¶¶ 37-39, 52; Mot. 4:17-22.)  The Service Fee Schedules state what drivers must pay Uber for use of the Uber App.  (*See* Am. Compl., Ex. F ("In exchange for your access to and use of the Software and Service, including the right to receive the Requests, you agree to pay to the Company a fee for each Request accepted, in the amount of 20% . . . of the total fare . . . ").

Plaintiffs admit that their earnings are governed by these Schedules.  (*See* Declaration of William L. Stern in Supp. of Uber's Opp'n to Mot. for Sum. J. ("Stern Decl."), Ex. A [Deposition of Matthew Clark], 30:12-44:13; Ex. B [Deposition of Ryan Cowden], 51:10-16, 75:21-76:14; Ex. C [Deposition of Dominicus Rooijackers], 52:17-53:2, 57:6-10, 64:7-65:10; Ex. D

---

[4] Plaintiffs are subject to the December 2015 Agreement.  Each Agreement supersedes the last, and each Plaintiff was driving when the December 2015 Agreement became operative.

[5] Exhibit F to the Amended Complaint is admissible.  (JSUF #1.)

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE No. 4:16-cv-02499-YGR
sf- 3821546

4

1  [Deposition of Jason Rosenberg], 34:5-25.)[6]

2         **3.    Driver Earnings on "Minimum Fare" Trips.**

3         For extremely short trips, the calculation BF+M+T may not be sufficient to justify the

4  ride.  In that case, Uber suggests a minimum fare.  (*See, e.g.*, Stern Decl., Ex. E [Deposition of

5  Michael Colman] at 113:23-114:3 (clarifying that a "minimum fare" is "the minimum amount a

6  rider would pay" for a trip).)  When a trip ends, the App calculates the BF+M+T.  If the total is

7  less than the minimum, the shortfall is added so that the rider pays the minimum amount.  (*See,*

8  *e.g.*, Stern Decl., Ex. L [Cowden Depo., Ex. 13] at 4.)  That becomes the Fare—capital F—on

9  minimum fare rides.  As with regular rides, a driver earns 80% of the Fare.

10        **D.    Changes to Fare Calculation.**

11        The Agreements give Uber the right to "change the Fare Calculation at any time in the

12  Company's discretion based on local market factors . . . ."  (¶ 4.2.)[7]  The only limitation is that

13  Uber must give notice.  (*Id*; *see also* Am. Compl. ¶¶ 6, 36; Mot. 12:23-13:3 (noting that Uber can

14  change the inputs in the "Fare Calculation" with notice).)  Plaintiffs all understood and agree that

15  Uber can change the Fare Calculation.  (Stern Decl., Ex. A at 29:16-30:3; Ex. B at 45:6-17,

16  47:20-48:3, 48:10-12, 52:6-14; Ex. C at 49:8-20; Ex. D at 32:8-33:6.)

17        **E.    The Safe Rides Fee.**

18        In April 2014, Uber instituted a "Safe Rides" program as part of Uber's "continued efforts

19  to ensure the safest possible platform for Uber riders and drivers."  (Am. Compl. ¶¶ 42-46; *id.*,

20  Ex. A at 2.)  As part of the program, Uber increased by $1 the total amount riders would pay for

21  all transportation services, including minimum fare rides.  (Am. Compl. ¶¶ 42-46; *id.*, Ex. A at 2.)

22  Uber notified drivers of this change in two ways.

23        **1.    The April 2014 Email.**

24        Uber emailed drivers informing them of the new SRF.  (Am. Compl., Ex. A ("April 2014

25        [6] The pages to Plaintiffs' depositions cited in this Memorandum are attached to the Stern
26  Declaration as Exhibits A through D.  Exhibits to Plaintiffs' depositions cited in this
   Memorandum are attached to the Stern Declaration as Exhibits G through U.

27        [7] The operative June 2013 Agreement also has a substantially similar "change" provision,
   except that it is not qualified by the "local market factors" clause.  (*Cf.* Am. Compl., Ex. B [page
28  5 of 17: "Service Fees"].)

email"); Mot. 5:21-23.)[8]  The April 2014 email stated (among other things) that the SRF will:

- "not reduce your earnings" and will "not affect your earnings"

- be "included in the fare displayed at the end of a trip, but will not appear on the weekly payment statement"

The email included a sample trip fare calculation.  (April 2014 email at 2.)  It uses a hypothetical $10 Fare.  The sample illustrates that drivers would earn exactly the same $8.00 after the SRF as before, even though the "total rider payment" increased by $1.00:

| | Old | New (ridesharing) |
|---|---|---|
| Fare | $10.00 | $10.00 |
| Safe Rides Fee | -- | $1.00 |
| Total Rider Payment | $10.00 | $11.00 |
| Partner Earnings Description | 80% of Fare | 80% of Fare |
| Partner Earnings | $8.00 | $8.00 |

Messrs. Clark and Rosenberg were active on the Uber App when the SRF was implemented.  (JSUF #2(a), (b).)  They received the email.  (Stern Decl., Ex. A at 53:22-54:2; Ex. D at 53:7-21.)  All four Plaintiffs understood the SRF email to mean that their earnings would not change even though riders would pay an additional dollar in their total fares.  (Stern Decl., Ex. A at 53:17-54:9, 55:24-56:2, 58:9-11; Ex. B at 63:4-7; *see also* Ex. B at 73:10-20, 82:23-25; Ex. C at 71:18-21, 72:14-15, 76:11-18; Ex. D at 51:18-25, 53:7-21.)

### 2.   The Change to the Service Fee Schedules.

Uber also changed the Service Fee Schedules.  The post-SRF Service Fee Schedules recite:  "[Y]ou agree to pay to the Company a fee [expressed as a percentage] of the total fare *minus the $1 Safe Rides Fee*."  (Am. Compl., Ex. F (emphasis added).)  The parties agree that "total fare" means "the fare that the Rider paid for transportation services, plus the additional dollar Uber added for the Safe Rides Fee."[9]  (Mot. 15:15-17.)  Because the "total fare" included

---

[8] The April 2014 Email is admissible.  (JSUF #1.)

[9] Put simply, "total fare" is the total amount a rider pays.  "In the case of a minimum fare, the total fare would be the minimum fare."  (Stern Decl., Ex. E at 141:14-15.)

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

6

the SRF on every trip, Uber increased the minimum fare by $1 dollar to reflect the total minimum amount, including the SRF:

| Rates | uberX | uberXL | SELECT |
|---|---|---|---|
| Base Fare | $1.00 | $2.85 | $4.00 |
| Per Mile | $1.10 | $2.20 | $2.25 |
| Per Minute | $0.15 | $0.30 | $0.30 |
| Safe Rides Fee | $1.95 | $1.95 | $1.95 |
| Minimum Fare | $5.95 | $7.95 | $10.95 |
| Cancellation Fee | $6.00 | $6.00 | $10.00 |

### F.      The "Continued Use" Clause.

All of the agreements save the 2013 Agreement provide that "continued use of the Uber "Service or Software after any modifications or supplements to the Agreement shall constitute" consent to such changes.  (June 2014 Agreement at 16; *see also* November 2014 Agreement at ¶ 14.1.)  All Plaintiffs either continued to use the App—or, in the case of Messrs. Cowden and Rooijackers, started to use the App—after April 2014 when the SRF was implemented.  (Stern Decl., Ex. A at 23:3-13, 106:12-107:22; Ex. B at 31:20-32:2; Ex. C at 34:5-6; Ex. D at 20:20-25.)

### G.      The SRF in Minimum Fare Rides: Receipts Demonstrate Fare Breakdowns for Before and After the SRF.

Consistent with the April 2014 email, all post-SRF receipts showed the SRF as a separate line item.[10]  This was true for both minimum fare and regular fare trips.  (*Compare, e.g.*, Decl. of Rosemary Barajas in Supp. of Uber's Opp'n to Mot. for Sum. J. and Cross-Mot. for Summ. J. ("Barajas Decl."), Ex. A [Post-SRF Regular Fare Trip] *with* Stern Decl., Ex. L at 4 [Post-SRF Minimum Fare Trip].)  The following is an example of a pre-SRF minimum fare receipt from Chicago, Illinois.  (Stern Decl., Ex. L at 2.)  Here's what it shows:

---

[10] Plaintiffs contend that the SRF appears as a "discrete" line item only on regular fare receipts, but not on minimum fare receipts.  (Mem. 7:24-26.)  This is wrong.  The format of both receipts is identical, and both are shown as discrete line-items.

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

7

1

2

3

4

5

6

7

8



9        In this pre-SRF example, the base fare is $2.40.  The distance and time include only an

10   additional 10¢ and 12¢, respectively, bringing the BF+M+T "Fare Calculation" to $2.62.  Then,

11   an additional 58¢ is added, bringing the "total fare" to $3.20.  Pursuant to Paragraph 4.1, the

12   driver is entitled to 80% of this "Subtotal", i.e.:  $3.20 x .80 = **$2.56**.

13        Now, consider the following minimum fare receipt *after* the SRF was implemented, also

14   from Chicago.  (Stern Decl., Ex. L at 4.)  This one is dated April 27, 2014:

15

16

17

18

19

20

21

22

23        In this post-SRF example, the base fare is still $2.40.  The distance charge is 38¢ and the

24   time charge is 36¢.  The BF+M+T equals $3.14.  Another 6¢ is added to get to the $3.20

25   minimum subtotal (the Fare), then the SRF charge of $1.00 is added, resulting in a "total fare" of

26   $4.20.  The "$4.20 Minimum" listed on the receipt thus reflects the total minimum amount a rider

27   will pay for transportation services after the SRF was implemented.  However, that's not the

28   multiplicand for purposes of calculating the drivers' earnings.  Rather, in accordance with the

1  new Service Fee Schedules, the SRF is first subtracted from the "total fare," and the difference

2  ($3.20) becomes the Fare for purposes of Paragraph 4.1.  Thus, the driver would earn 80% x

3  $3.20, i.e.: $4.20 - $1.00 = $3.20 x .80 = **$2.56**.  Exactly the same as the pre-SRF minimum fare

4  ride.[11]

5          H.      **Plaintiffs' Post-SRF Correspondence Confirms They Understand Post-SRF**
               **Earning Calculations.**

6

7          The four Plaintiffs each had correspondence with Uber after the SRF was implemented.  It

8  is revealing, as it shows they understood perfectly how their earnings were calculated and knew

9  also that the SRF did not impact their earnings, either on regular or minimum fare trips.

10         **Rosenberg Email.**  On October 12, 2015, Uber emailed drivers in San Francisco to

11 announce that it was raising the SRF by $0.35, to $1.35.  (*See* Stern Decl., Ex. R [Rosenberg

12 Depo., Ex. 12] at 1-2.)  Mr. Rosenberg responded that day, asking: "So all minimum fares will

13 increase by $0.35, right?  That way this is not just another pay cut." (*Id.* at 1.)  An Uber

14 representative replied that "The Safe Rides Fee charged on every trip changed from $1.00 to

15 $1.35." (*Id.* at 2.)  She further stated that the "change does not affect the amount you take home

16 per trip.  As usual, you will see the Safe Rides Fee as a separate line item on your payment

17 statement and partner dashboard, and it will be collected by Uber along with the service fee."

18 (*Id.*)  Mr. Rosenberg did not respond to this email.  (*Id.*)  Mr. Rosenberg did not remember this

19 email at his deposition, but stated that it "sound[ed] like him." (Stern Decl., Ex. D at 77:12-14.)

20         **Clark Email.**  Mr. Clark emailed Uber on May 28, 2014, with a question about his

21 earnings.  (Stern Decl., Ex. G [Clark Depo., Ex. 10] at 1.)  An Uber representative responded by

22 explaining, "[f]or your fares this week it appears that you are not taking our new $1 Safe Rides

23 Fee into account.  This is added on top of *all* fares.  So we take it out in addition to our 20 percent

24 fee on each ride at the end of the week." (*Id.* at 4 (emphasis added).)  Mr. Clark replied by

25 referencing the April 2014 email, acknowledging that he understood the email to mean that

26

27         [11] *See also* Stern Decl., Ex. I [Clark Depo., Ex. 12 (Philadelphia Pre-Post SRF Receipt);
   Ex. O [Rooijackers Depo., Ex. 10 (San Francisco Pre-Post SRF Receipt); Ex. T [Rosenberg
   Depo., Ex. 14 (Los Angeles Pre-Post SRF Receipt).)  The receipts addressed in Rosenberg's
28 depositions were receipts from actual minimum fare rides that *he* provided.  (Stern Decl., Ex. T.)

"[riders] are responsible for [the SRF:] it's not supposed to be another dollar off of my fair [sic]."
(*Id.*)  He then clarified his understanding with the following calculation: "Fare old is 8, fare new
is 8 plus $1 rider fee, equals $9 new fare, *which I am still getting 80 percent of 8, not 7*."  (Stern
Decl., Ex. A at 78:3-9 (emphasis added); *see also* Stern Decl., Ex. G [Clark Depo., Ex. 10] at 4.)
Mr. Clark did not remember his email, but confirmed that was his name at the top, and that he
used Zendesk to communicate with Uber about fare questions.  (Stern Decl., Ex. A at 74:6-22.)

**Rooijackers Email.**  Mr. Rooijackers emailed Uber on January 17, 2016, with a fare
question. (Stern Decl., Ex. P [Rooijackers Depo., Ex. 12] at 1.)  Uber responded by providing a
breakdown of the riders' fare, which included the SRF.  (*Id.*)  Based on the example in the email,
Mr. Rooijackers understood the SRF was being deducted from the total fare.  (Stern Decl., Ex. C
at 123:15-23.)

**Cowden Email.**  Mr. Cowden admits that he communicated with Uber about fare
questions (*see, e.g.*, Stern Decl., Ex. J [Cowden Depo., Ex. 11], Ex. K [Cowden Depo., Ex. 12])
but confirms he never raised his concerns about the SRF being taken out of minimum fares.
(Stern Decl., Ex. B at 90:15-92:3.)  He's not sure why.  (*Id.* at 92:3.)

### I.     Plaintiffs' Weekly Statements and Form 1099Ks Confirm They Understand the SRF Is Not Included in Their Earnings.

Additional evidence confirms Plaintiffs' understanding that the SRF is not taken "out of"
drivers' earnings.  To start with, the weekly payment statements show that "rider fees" are added
to the fare and then subtracted before calculating driver earnings.  (*See* Stern Decl., Ex. H [Clark
Depo., Ex. 11]; Ex. S [Rosenberg Depo., Ex. 13]; Ex. N [Cowden Depo., Ex. 15].)  In deposition,
each Plaintiff admitted this and understood this subtraction to mean that the SRF did not impact
their earnings.  (*See* Stern Decl., Ex. A at 82:5-13, 84:23-85:4; Ex. D at 84:3-13; Ex. B at 100:7-
12; Ex. C at 128:6-140:1.)

The SRF is also shown as a deduction from earnings on tax summaries on the Form
1099Ks that drivers receive.  (*See, e.g.*, Stern Decl., Ex. U [Rosenberg Depo., Ex. 15]; Ex. M

1  [Cowden Depo., Ex. 14]; Ex. Q [Rooijackers Depo., Ex. 16].)[12]  Plaintiffs authenticated these

2  documents as well.  (*See* Stern Decl., Ex. B at 97:17-99:10; Ex. C at 135:8-17.)

3        **J.**      **Plaintiffs' Deposition Testimony Impeaches the Amended Complaint.**

4        All of the Plaintiffs ultimately agreed that, after the SRF was implemented, their earnings

5  would not change, and that they were entitled to 80% of total amount collected from a rider on a

6  minimum fare trip *minus the safe rides fee*.  (*See* Stern Decl., Ex. A at 55:24-56:2, 102:5-22,

7  105:14-106:2; Ex. D at 51:18-21; Ex. B at 73:10-20; Ex. C at 75:20-77:15; *see also* Ex. C at

8  79:10-18, 87:14-25.)

9  **III.**      **LEGAL STANDARD**

10        Summary judgment is appropriate when no genuine dispute as to any material fact exists.

11  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.

12  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

13        A party seeking summary judgment bears the initial burden of identifying those portions

14  of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of

15  a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Ward v.*

16  *Apple Inc.*, No. 12-cv-05404-YGR, 2017 WL 1075049, at *3 (N.D. Cal. Mar. 22, 2017).  Where

17  the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no

18  reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty Payless,*

19  *Inc*., 509 F.3d 978, 984 (9th Cir. 2007).

20  **IV.**      **THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR SUMMARY**
21               **JUDGMENT FOR THREE REASONS**

22        The Court should deny Plaintiffs' motion for summary judgment for three reasons.  First,

23  the event that Plaintiffs allege amounts to a breach never happened.  Second, there was no breach

24  of contract under a plain reading of the Agreements and Service Fee Schedules.  Third, the

25  change to the Service Fee Schedules was a change to the Fare Calculation.

26

27

28        [12] The Weekly Statements and Form 1099Ks do not specifically use the term "Safe Rides Fee," however, they show that deductions for Uber fees are not part of a driver's taxable earnings.

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-CV-02499-YGR
sf- 3821546

11

**A.      Reason No. 1—Uber Never "Took" the SRF "Out of" Driver Earnings.**

Plaintiffs' case is built on two core allegations.  The first is that Uber took the SRF "*out of* the drivers' own fares, as opposed to adding that fee on top of those fares and charging it to the rider."  (Am. Compl. ¶ 53 (italics added); *see also id.*, ¶¶ 9, 50; Mot. 6:26-7:1.)  The second is that the minimum fare was treated differently than regular fare rides from the standpoint of driver earnings, hence, Plaintiffs assail the SRF on only minimum fare rides.  (Am. Compl. ¶ 53; Mot. 7:23-8:4.)

Plaintiffs are wrong.  Both allegations are myths.

**1.      Myth No. 1—Uber Never Took The SRF "Out Of" Driver Earnings.**

Plaintiffs have the burden of proving their allegation that Uber took the SRF "out of" driver earnings.  *See Gen. Bus Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (plaintiff must offer "significant probative evidence tending to support the complaint"); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute") (citation omitted).  Plaintiffs have no evidence of this alleged fact.  If this were trial, they would be non-suited.

The reason Plaintiffs have no evidence is because it never happened.  Instead, the undisputed facts show that drivers earned exactly the same amount after, as before, the SRF.

This is clear from the receipts.  As shown in Part II.G., above, drivers earned exactly the same before, and after, the SRF.  In the "before" receipt, the Paragraph 4.1 calculation (BF+M+T) yields $2.56 in earnings.  In the "after" receipt, it is exactly the same:  $2.56.

This follows for a simple reason:  A driver is entitled only to 80% of the Fare.  But as Plaintiffs admit, "the Safe Rides Fee … is not part of the driver-owned 'fare'."  (*Cf.* Mot. 15:18-19.)

One reaches the same $2.56 result through the lens of the Service Fee Schedule, which instructs that the driver will "pay to the Company" a fee—here, 20%—of the "total fare minus the $1 Safe Rides Fee."  Here, the driver would owe Uber 20% x ($4.20 - $1) = **<u>64¢</u>**.  Thus, from the total fare of $4.20, Uber's 64¢ fee *and the SRF* would be subtracted, resulting in driver earnings of $2.56 ($4.20 - $1.00 – $0.64 = **<u>$2.56</u>**).  Either way, whether looking at the Fare Calculation or

1   the Service Fee Schedules, the driver's earnings didn't change after the SRF.[13]

2       A driver whose earnings didn't change cannot have had the SRF taken "out of" his

3   earnings.  The very proposition is a logical impossibility.

4       Mr. Cowden understood this:

5       Q. And if Uber added the additional dollar to the fare and the
        drivers all took home the same amount before and after, in your
6       opinion that would be okay?

7       MR. ROONEY: Objection; misstates witness testimony, vague,
        incomplete hypothetical.

8
        THE WITNESS: If they still took $3.20 out of – and $3.20, both
9       before and after, it would have been appropriate for the driver, yes.

10  (Stern Decl., Ex. B at 82:17-25.)

11      That the SRF was not taken "out of" driver earnings is corroborated by the April 2014

12  Email, the drivers' Weekly Statements, and the Form 1099Ks.  It is also clear from the deposition

13  testimony of the company's PMK witnesses.  (Stern Decl., Ex. E at 117:23-118:6, 145:21-23;

14  Stern Decl., Ex. F [Deposition of Alexander Priest] at 47:11-13.)

15      Plaintiffs disagree.  However, their sole evidence that the SRF was taken "out of" drivers'

16  earnings consists of nine lines from the deposition testimony of Uber's PMK, Michael Colman.

17  (Mot. 8:1-8:5.)  Let's take a closer look.

18      In those nine lines, Plaintiffs asked Mr. Colman if the SRF was *included* in the minimum

19  fare.  He answered yes.  (Stern Decl., Ex. E at 114:13-21.)  Plaintiffs didn't ask Mr. Colman the

20  right question.  They should have asked, "Did Uber take the SRF out of drivers' earnings?"  After

21  all, that is what they must prove.  As it is, Plaintiffs place great stock in Mr. Colman's answer.

22  They shouldn't.  The question is meaningless.  And the answer is a red herring.

23      First, Mr. Colman clarified in his deposition that "minimum fare" is "the minimum

24  amount *that a rider would pay*."  (Stern Decl., Ex. E at 114:1-7 (emphasis added).)  Mr. Colman

25  _____

26      [13] Plaintiffs set forth a hypothetical where a driver changes the fare amount to $1 in a
    minimum fare ride.  (Mot. 17:17-18:2.)  In this case, they argue, the full $1 would go to Uber,
    leaving nothing for the SRF.  (*Id.*)  But Plaintiffs set forth no evidence showing whether or not
27  Uber would, in that case, charge the rider an additional $1 to make up for the missing SRF.
    Moreover, their Amended Complaint alleges no instance where a driver charged a lower fare than
28  the set minimum fare amount.

did *not* characterize the minimum fare as Fare—with a capital F (i.e., BF+M+T).  Thus, Mr. Colman answered correctly.  To return to the post-SRF receipt, shown above, if you are asking, "Is the SRF 'included' in *the $4.20 total fare*?" the answer is yes.  If you are asking, "Is the SRF 'included' *in the $3.20 Subtotal*?," the answer is no.  Either way, the answer is irrelevant.  It is irrelevant because it doesn't address the question Plaintiffs need to prove:  Did Uber take the SRF *out of* driver-owned fares?[14]

Second, whether the SRF was "included" in the minimum fare or not tells us nothing about what actually happened.  Fortunately, we don't have to guess.  As we have just seen, in the real world receipts, the driver earned $2.56 both before, and after, the introduction of the SRF. Thus, drivers' earnings did not decrease.

Third, the Agreements do not use the adjective "included."  It is a made-up term.  Because "included" is not a textual contract term,[15] it cannot assist the Court's interpretation.  *Cf.* Cal. Civ. Code § 1639 (parties' intent should be inferred exclusively from the written provisions in the contract).  What governs is Paragraph 4.1.  As Plaintiffs admit, this language is "clear."  (Am. Compl. ¶ 9.)  And under that "clear" formula, the driver (in the above example) would earn 80% of $3.20, or $2.56—and not, as Plaintiffs claim, 80% of $4.20, or $3.36.  Plaintiffs have no contractual right to 80¢ of the one dollar SRF.

The product of 80% x Fare is all that drivers own, nothing more.  They have no claim to the SRF, or any percentage of it.  As the December 2015 Agreement makes clear, drivers "acknowledge and agree that the Fare provided under the Fare Calculation is the only payment [drivers] will receive in connection with the provision of Transportation Services…."  (Am. Compl., Ex. E, ¶ 4.1; *see also id.*, ¶ 4.7 (drivers "acknowledge and agree" that they are not

---

[14] Plaintiffs posed the same question to Uber's Alex Priest, who said:  "You had asked me if the minimum fare – or if the Safe Ride Fee was included in the minimum fare . . . .  It's my understanding that actually, we did adjust the minimum fare up by a dollar when the Safe Ride Fee was announced."  (Stern Decl., Ex. F at 47:8-13.)  Plaintiffs do not cite Mr. Priest's answer.

[15] Courts do not rewrite contracts, or read new promises into them, under the guise of interpreting or construing them.  *Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1073, 1078 (2003); *Grebow v. Mercury Ins. Co.*, 241 Cal. App. 4th 564, 573-74 (2015), *as modified on denial of reh'g* (Oct. 26, 2015); *Baldwin v. AAA N. Cal., Nev. & Utah Ins. Exch.*, 1 Cal. App. 5th 545, 555 (2016), *as modified* (July 13, 2016); *see also S. Cal. Counseling Ctr. v. Great Am. Ins. Co.*, 162 F. Supp. 3d 1045, 1052-53 (C.D. Cal. 2014).

1    entitled to "additional monetary amounts" except "as expressly set forth in this Agreement".)[16]

2            In sum, the Court should deny Plaintiffs' motion for summary judgment on the ground

3    that they have no evidence of their key fact, i.e., that the SRF was taken out of driver earnings.

4                    **2.      Myth No. 2—Minimum Fare Rides and Regular Rides Are Not
                             Treated Differently.**
5

6            Plaintiffs' second myth is that minimum fare rides were handled differently than regular

7    fare rides.  As they put it, the SRF was taken "out of" driver earnings only on minimum fare

8    rides, but not on regular rides.  (Am. Compl. ¶ 53; Mot. 7:24-26, 8:1-3.)  They also contend that

9    the SRF appears as a "discrete" line item only on regular fare receipts, but not on minimum fare

10   receipts.  (Mem. 7:24-26.)  But they have no evidence because, again, this never happened.

11   Minimum fare and regular fare rides were treated in every respect the same.

12           Let's review the hierarchy of evidence, starting with the contracts.[17]

13           The Agreements do not differentiate between regular and minimum fare rides.  They

14   never even use the phrase "minimum fare."  Nor do the Service Fee Schedules differentiate

15   between minimum and regular fares.[18]  (Mot. 7:9-13.)  There is no need.  A minimum fare uses

16   the same Fare Calculation as other rides.  Thus, all driver earnings are calculated the same,

17   namely, under Paragraph 4.1.  That paragraph, in turn, says "where such Fare is calculated based

18   upon a base fare amount plus mileage and/or time," a driver earns 80% of "such Fare."

19           Minimum fares are calculated using the same formula.[19]  In looking at the receipts for

20   minimum fare rides, the Fare (BF+M+T) is first calculated, then an amount is added to roll up to

21   the minimum.  The receipts refer to this as the "Subtotal."  That Subtotal is the multiplicand, not

22   the Subtotal *plus* the SRF.  As explained, the SRF is not part of BF+M+T.

23           Next, there is the April 2014 email.  It does not expressly mention minimum fares.  But

24

25           [16] *Cf.* Am. Compl., Ex. C at 5; *id.*, Ex. D, ¶ 4.7.

26           [17] As noted in Part II.A.4., the contracts include the Service Fee Schedules.

27           [18] The Service Fee Schedules do, however, mention minimum fares.  (Am. Compl., Ex.
     F.)

28           [19] The only difference is that the calculations "roll up" to a minimum amount (shown on
     receipts as the Subtotal).

1   why would it?  The agreements don't either.  The April 2014 email notifies drivers that $1 would

2   be *added* to the lowercase-f "fare."  Implicit in this statement is that one dollar would be added to

3   *all* fare types, including minimum fares, because (as just noted) the agreements do not

4   differentiate between regular and minimum fares.  Plaintiffs' meaning—that the email referred

5   only to regular rides—is not reasonable.  *Legacy Vulcan Corp. v. Super. Ct.*, 185 Cal. App. 4th

6   677, 688 (2010) ("We consider the contract as a whole and interpret its language in context so as

7   to give effect to each provision, rather than interpret contractual language in isolation.").

8        Next are the rider receipts.  As explained above, these show the $1 SRF as an *additional*

9   sum above the "Subtotal."  The SRF is then *subtracted* from the total fare (lowercase-f) a rider

10  pays (i.e., the minimum fare) before driver earnings are calculated.  This makes clear that the

11  capital-F "Fare" does not include the SRF.  Moreover, Plaintiffs' contention that, unlike on

12  regular rides, the receipts on minimum fare rides failed to "properly and discretely charge[] the

13  SRF to its Rider customers as an *additional* sum" is flat wrong.  (*Cf.* Mot. 7:24-28, 8:1-3.)  In

14  both regular and minimum fare ride receipts, Uber showed the SRF as a separate and discrete line

15  item.  Format-wise, the receipts are identical.[20]

16       All the evidence, undisputed, proves that Uber collected the extra dollar from riders.

17  What drivers earned was exactly the same after the SRF as before.  Thus, what Uber told drivers

18  in the April 2014 email would happen, did happen:  The SRF "will not reduce your earnings."

19  The notion that the SRF was taken "out of" drivers' earnings never happened.  Not on regular

20  rides, and not on minimum fare rides.  The Court should deny Plaintiffs' motion for summary

21  judgment.

22       **B.      Reason No. 2—There Was No Breach of Contract.**

23       If the Court were to conclude there is no evidence that the SRF was taken "out of" drivers'

24  earnings, as Uber just showed, it could stop reading and deny Plaintiffs' motion for failure to

25  prove a fact essential to their claim.  Nevertheless, there is a second independent basis on which

26  to deny Plaintiffs' motion, and it is legal:  There was no breach of contract.

27

28       _____

     [20] For comparison, see Barajas Decl., Ex. A (showing a regular fare receipt for a drive
     with Plaintiff Jason Rosenberg).

1.     **The Rules of Construction.**

The court's interpretation must "give effect to the mutual intention of the parties" as it existed at the time the contract was formed.  Cal. Civ. Code § 1636.

That mutual intention, where possible, should be inferred exclusively from the written provisions in the contract.  Cal. Civ. Code § 1639.  *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 27 (2006).  Courts ascertain "'the intent and scope of [an] agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made.'"  *Riverside Sheriffs' Ass'n v. Cty. of Riverside*, 173 Cal. App. 4th 1410, 1424 (2009) (citation omitted).  "If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." *Legacy Vulcan*, 185 Cal. App. 4th at 688; Cal. Civ. Code § 1638; *Marder v. Lopez*, 450 F.3d 445, 449 (9th Cir. 2006).  Where the contractual language is clear on its face, the analysis stops there and goes no further.  Cal. Civ. Code §§ 1638-1639; *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 392-93 (2006); *see generally Int'l Inc. Co. of Hannover v. ACW Constr., Inc.*, No. 15-cv-00544-YGR, 2015 WL 6954962, at *3 (N.D. Cal. Nov. 10, 2015).

2.     **The Contracts Don't Say What Plaintiffs Claim.**

Plaintiffs contend that when Uber increased the total fare by $1 to account for the SRF, that increase became part of the Fare—capital F—that drivers "own," hence, drivers get 80¢ of that dollar.  (Mot. 6:26:1-8.)  They are wrong.  The contracts say no such thing.

Paragraph 4.1 sets forth the calculation for drivers' earnings.  It says that "where such Fare is calculated based upon a base fare amount plus mileage and/or time," a driver earns a percentage (set forth in the Service Fee Schedules) of "such Fare."  The SRF is not part of the "base fare," "mileage," or "time."  It is *in addition to* the Fare.

Plaintiffs admit this is true for regular fare rides.  (Mot. 7:24-26.)  But minimum fare rides are no different.  When a rider takes a trip whose cost turns out to be less than the minimum, her Fare is calculated using the same formula:  BF+M+T.  (*See* Part IV.A.2., above.)  The Fare is then rolled up to a minimum amount (shown as the "Subtotal" on minimum fare ride receipts).  The SRF is *in addition to* the Fare, be it a minimum fare or a regular fare.

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

17

The Service Fee Schedules should end the debate:  "[Y]ou agree to pay to the Company [80%] of the total fare *minus the $1.00 Safe Rides Fee*."  (Am. Compl., Ex. F (emphasis added).) The Fare, for purposes of Paragraph 4.1, is calculated after subtracting the SRF.  The Fare Calculation is all that drivers earn, nothing more.  (¶¶ 4.1, 4.7 [December 2015 Agreement].)

The Agreements are "clear."  (Am. Compl. ¶ 9; Mot. 9 n.8.)  There was no breach of contract.

### 3.    Plaintiffs' Interpretation Is At Odds With The Extrinsic Evidence

If the Court nevertheless believes there is ambiguity as to whether the SRF is part of the Fare Calculation,[21] the Court may resolve that ambiguity by resort to extrinsic evidence.  *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968); *see also Jade Fashion & Co. v. Harkham Indus., Inc.*, 229 Cal. App. 4th 635, 652 (2014) (if extrinsic evidence reveals that apparently clear language in the contract is, in fact, "susceptible to more than one reasonable interpretation," then extrinsic evidence may be used to determine the contracting parties' objective intent); *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 69 (2017).  Here, there are several sources of extrinsic evidence that reject Plaintiffs' interpretation of Paragraph 4.1 and support Uber's.

First, there is the April 2014 email.  Plaintiffs admit the April 2014 email is clear.  (Am. Compl. ¶ 9; Mot. 5:23-24.)  And so it is.[22]  Contrary to Plaintiffs' interpretation, it clearly notified drivers that the SRF would be added to riders' total fares and then *deducted* from the total fare before calculating drivers' earnings.  It states that drivers would *not* share in the SRF.  In particular: (1) the fee is collected from riders; (2) the SRF would be a "separate line item on every receipt"; (3) it is "a *dedicated* $1 Safe Rides Fee"; and (4) the SRF "will not reduce your earnings" and "will not affect your earnings."  A "before-and-after" chart in that email shows driver earnings would stay the same.  By Plaintiffs' interpretation, the SRF would *not* be

---

[21] "Ambiguity cannot be based on a strained instead of reasonable interpretation" of the contract's terms.  *McKee v. State Farm Fire & Cas. Co.*, 145 Cal. App. 3d 772, 776 (1983).

[22] As Mr. Rosenberg testified, the statement "the Safe Rides Fee will not affect your earnings" is "written as simple as possible" and he understood it meant just that, "It won't affect my earnings."  (Stern Decl., Ex. D at 51:18-21.)  Moreover, he agreed with the calculation shown in the chart that he would earn 80% of the *pre*-SRF amount.  (*Id.* at 56:18-58:22.)

1    "dedicated" (rather, 80¢ of every $1 would go to drivers), and the SRF *would* "affect driver

2    earnings."  That is exactly the opposite of what the April 2014 email says.

3        <u>Second</u>, there are the rider receipts, the Weekly Statements, and the 1099Ks.  Contrary to

4    Plaintiffs' interpretation, the SRF is shown as a *deduction* from earnings on the (i) before- and-

5    after receipts on actual minimum fare rides driven by Plaintiffs (*see* Stern Decl., Exs. I, T); (ii)

6    drivers' weekly earnings statements (*see, e.g.*, Stern Decl., Ex. H; Ex. A at 82:5-13; Ex. S; Ex. D

7    at 84:3-13); and (iii) 1099Ks (*see, e.g.*, Stern Decl., Ex. M; Ex. B at 97:17-99:10.)

8        <u>Third</u>, Plaintiffs' position is impeached by their deposition testimony.  As noted already,

9    all four understood the April 2014 email to mean that drivers were *not* entitled to the SRF, and all

10   understood that to lay claim to 80% of the SRF would be inconsistent with the April 2014 email.

11   Moreover, each of the four Plaintiffs made the following admissions.  (*See* Part II.F., *supra*.)

12       Mr. Cowden testified that if Uber added $1 to the minimum fare, and if a driver got the

13   same amount before and after the SRF, that would be perfectly okay.  (Stern Decl., Ex. B at

14   82:17-25.)  He admits that if a regular fare is $20 plus a SRF, he gets 80% of $20, not $21, and he

15   wouldn't expect to see 80% the addition $1 collected for the SRF.  (*Id*. at 70:21-71:6.)  As for

16   minimum fare rides, Mr. Cowden admits in the example included in the April 2014 email that the

17   driver gets 80% x $4, not 80% of $5.  (*Id*. at 64:17-65:12; *see also id*. at 66:8-19 (80% of the

18   Fare—$4), 69:19-23, 71:19-72:8.)  Finally, he agrees that if a driver earns the same before and

19   after the SRF, then adding the SRF is appropriate for Uber to do.  (*Id*. at 73:10-20.)

20       Mr. Clark admits that once Uber added $1 to the minimum fare, he would get the same

21   80% of the *pre*-SRF fare.  (Stern Decl., Ex. A at 105:14-106:2.)  He understands the April 2014

22   email to mean that the SRF "wasn't going to affect [pay] at all."  (*Id*. at 25:14-15, 55:24-56:2

23   ("That my ride amount is still going to be the same as if it never changed"); 57:3-4 ("[T]hey

24   weren't taking that fee from us, but it was going to be taken from the rider"); 58:9-11 (He

25   understood "that the rider was paying more and that wasn't going to change your earnings").)  As

26   for the allegation that the SRF was taken out of driver earnings, he was asked, "And you also

27   understood that this would not reduce your earnings.  Is that what you thought?"  He answered,

28   "Yes[,]" and that it was "correct" that the SRF "would not affect [his] earnings."  (*Id*. at 99:10-12.)

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

19

Mr. Rooijackers was asked to assume a minimum fare ride in which the total fare was $4. He admits that Uber could subtract $1 from the total fare, then take 20% of the remaining $3.00. (Stern Decl., Ex. C at 94:7-19.)  As for the April 2014 email, he admits that the phrase "will not *affect* your earnings" means he would be taking home the same amount before and after the SRF. (*Id.* at 75:20-77:15; *see also id.* at 79:10-18, 87:14-25.)  He also understood that the SRF would not show up on his weekly statement.  (*Id.* at 82:8-22.)

Mr. Rosenberg admits he would earn 80% of the minimum fare *not* including the SRF. (Stern Decl., Ex. D at 108:8-110:5.)  The statement "the Safe Rides Fee will not affect your earnings" is "written as simple as possible.  It won't affect my earnings."  (*Id.* at 51:18-21.)  He agrees with the Table (included in the April 2014 email) that says he gets 80% of the *pre*-SRF amount.  (*Id.* at 56:18-58:22.)

## C.    Reason No. 3—The Court Could Deny Summary Judgment On An Alternative Ground, Paragraph 4.2.

Paragraph 4.1 is clear.  Summary judgment should be denied on the ground that the SRF was not part of the Fare.  But if the Court feels there is doubt, there is an alternative interpretation.  The Court could regard the new Service Fee Schedules as a change to the Fare Calculation; that change is governed by Paragraph 4.2.  Plaintiffs admit that Uber had the right to make changes, provided it gives notice.[23]  (Am. Compl. ¶ 6; Mot. 12:23-13:2.)

In this view, to the extent the Court believes the agreements do not clearly put the SRF outside the Fare, the Service Fee Schedules leave no doubt.  They say:  "[Y]ou agree to pay to the Company [80%] of the total fare *minus the $1.00 Safe Rides Fee*."  (Am. Compl., Ex. F (emphasis added).)  This language is not susceptible to Plaintiffs' position that drivers were entitled to earn a percentage of the $1 increase.  That Plaintiffs continued to drive after receiving that notice (JSUF #2) constitutes their assent to the change.  (*Cf.* ¶ 4.2.)

The undisputed evidence demonstrates that Uber did not breach its contracts.  The Court

---

[23] Plaintiffs argue that, if Uber could change the Fare Calculation by implementing the Safe Rides Fee, Uber failed to give sufficient notice because it did not notify drivers that "Uber intended for the *Drivers* to pay the Safe Rides Fee out of the fares they owned."  (Mot. 14:9-18.) But the SRF was collected from riders, however, so this argument fails.

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

20

should deny Plaintiffs' motion for summary judgment. *See Citi Apts., Inc. v. Markel Ins. Co.*, Nos. C 06-5752 CW, C 06-7086 CW, 2007 WL 1689013, at *6 (N.D. Cal. June 11, 2007) (granting summary judgment where the facts did not support a finding that Defendant breached its contract).

## V.      THE COURT SHOULD GRANT UBER'S CROSS-MOTION FOR SUMMARY JUDGMENT

### A.      There Are No Disputed Fact Issues.

These are cross-motions for summary judgment.  While it is true that "[e]ach motion must be considered on its own merits" and that "both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present," *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted), there are no disputed facts on this record.

The key facts—the agreements, emails, deposition testimony—are not disputed.  Rather, the dispute turns on contract interpretation, which is solely a judicial function "unless the interpretation turns upon the credibility of extrinsic evidence." *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865 (1965); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1134 n.18 (2008).  But even where there is extrinsic evidence, as here, it is still a legal issue for the court unless there is a *conflict* in the extrinsic evidence.  *Wolf*, 162 Cal. App. 4th at 1125-26.  Here, there is no conflict.  There is nothing for a jury to decide.

### B.      The Court Should Enter Judgment for Defendants.

Uber's cross-motion for summary judgment is the obverse of Plaintiffs'.  There are no new or different facts, law, or argument.  Rather, it is filed in order to leave no "loose ends" if the Court were to deny Plaintiffs' motion.  Thus, if the Court agrees that Plaintiffs' motion should be denied for any of the three grounds asserted above (*see* Parts IV.A.-C), it should grant summary judgment in Uber's favor.  Alternatively, it could find there are no material fact questions and that Uber has established its affirmative defenses no. 1 (failure to state a claim), no. 3 (no damage), no. 4 (no injury), and/or no. 23 (consent).

DEFENDANTS' MPA IN OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:16-cv-02499-YGR
sf- 3821546

21

1

## VI.     CONCLUSION

2          For the foregoing reasons, Uber respectfully requests that the Court deny Plaintiffs'

3   motion for summary and grant Uber's cross-motion for summary judgment.

4   Dated: September 19, 2017              UBER TECHNOLOGIES, INC.

5                                          WILLIAM L. STERN
                                           CLAUDIA M. VETESI
6                                          ALEXANDRA LAKS
                                           LUCIA X. ROIBAL
7                                          MORRISON & FOERSTER LLP

8

9                                          By:    /s/ William L. Stern
                                                  WILLIAM L. STERN
10

11                                         Attorneys for Defendants
                                           UBER TECHNOLOGIES, INC.,
12                                         RASIER, LLC, RASIER-CA, LLC, RASIER-DC,
                                           LLC, AND RASIER-PA, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28