UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHUCK CONGDON, ET AL.**, <br><br>    Plaintiffs, <br><br> vs. <br><br> **UBER TECHNOLOGIES, INC., ET AL.**, <br><br>    Defendants. | Case No.  16-cv-02499-YGR <br><br> **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT; GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Re:  Dkt. Nos. 108, 109, 114 |

This action arises from claims that a class of drivers was not paid properly under the terms of certain written agreements.  Plaintiffs Matthew Clark, Ryan Cowden, Dominicus Rooijackers, and Jason Rosenberg ("plaintiffs") bring this putative class action against defendants Uber Technologies, Inc. ("Uber Tech"), Rasier, LLC, Rasier-CA, LLC, Rasier-DC, LLC, and Rasier-PA, LLC (the "Rasier defendants") (collectively, "Uber") for breach of contract and conversion, arising out of Uber's implementation of the so-called "Safe Rides Fee" as it relates to so-called "minimum fare" rides specifically.  (*See generally* Amended Complaint, Dkt. No. 49 ("FAC").)[1]

Currently before the Court are the following motions:  plaintiffs' motion for summary judgment (Dkt. No. 109 ("Plaintiffs' MSJ")); Uber's cross-motion for summary judgment (Dkt. No. 114 ("Defendants' Cross-MSJ")); and plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23(b)(3) (Dkt. No. 108 ("Class Cert. Motion")).[2]  Having carefully considered

---

[1] Plaintiffs sue on behalf of 9,602 drivers who opted out of arbitration.

[2] In connection with their motion for summary judgment and motion for class certification, plaintiffs filed administrative motions to seal certain documents.  (Dkt. Nos. 110, 111.)  The Court addresses both motions to seal in a separate order.

the pleadings in this action, the papers submitted, and oral arguments held on October 31, 2017, and for the reasons set forth below, the Court **ORDERS** as follows: The Court **GRANTS** plaintiffs' motion for summary judgment and **DENIES** Uber's cross-motion. The Court also **GRANTS** plaintiffs' motion for class certification.

I. **BACKGROUND**

The following facts are not subject to reasonable dispute unless otherwise noted. Uber Tech is a technology service company that, via a mobile phone application (the "App"), connects riders looking for transportation to drivers, such as plaintiffs. To utilize the App, each plaintiff in this action entered into certain agreements—depending on their location—with one of the Rasier defendants.[3] Relevant here, the agreements defined the default fare that drivers were entitled to charge riders and described the relationship between drivers and Uber.

A. **Fare Calculation and Uber's Relationship with Drivers**

After connecting with a rider through the App and completing a transportation service, the driver was entitled to charge a fare, which would be paid by the rider to Uber. Pursuant to the operative Agreement, the default amount charged for transportation services was calculated in accordance with Paragraph 4.1 of the Agreement, entitled "Fare Calculation and Your Payment." That provision provides:

> You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services (*"Fare"*), where such Fare is calculated based upon a base fare amount plus mileage and/or time amounts, as detailed for the applicable Territory (*"Fare Calculation"*). You

---

[3] The three agreements at issue in the instant lawsuit, all between drivers and one of the Rasier defendants, are: (1) the "Transportation Provider Service Agreement" (Dkt. No. 49-2 (the "2013 Agreement")); (2) the "Rasier Software Sublicense & Online Services Agreement" (Dkt. No. 49-3 (the "June 2014 Agreement")); and (3) the "Software License and Online Services Agreement" (Dkt. No. 49-4 (the "November 2014 Agreement")). (*See also* FAC ¶ 29.)

The parties agree that the three agreements are essentially identical regarding the substantive issues in this case. Given the substantive similarity between the three agreements, and in light of the fact that the November 2014 Agreement covers most of the class period, the parties have relied on the November 2014 Agreement in their briefing. (*See* Plaintiffs' MSJ at 3, 12; Defendants' Cross-MSJ at 2, 3 nn.2–3.) This Order shall do the same. Thus, unless otherwise stated, all citations and references to the "Agreement" pertain to the November 2014 Agreement. To the extent variations exist between the agreements, they do not alter the contractual analysis contained herein.

are also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services . . . .

(Agreement ¶ 4.1 (emphases in original).) Thus, pursuant to Paragraph 4.1, the default amount charged for transportation services was explicitly defined as the "Fare."[4]

With respect to drivers' relationship with Uber, the Agreement provides:

You: (i) appoint Company as your limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by you, applicable taxes and fees from the User on your behalf via the payment processing functionality facilitated by the Uber Services; and (ii) agree that payment made by User to Company shall be considered the same as payment made directly by User to you.

(*Id.*) Otherwise, the Agreement provides that "the relationship between the parties . . . is solely that of independent contractors." (*Id.* ¶ 13.1.)

Pursuant to the Agreement, drivers were entitled to negotiate the amount they charged riders for transportation services, thus foregoing the aforementioned default amount. Paragraph 4.1 continues:

[T]he parties acknowledge and agree that as between you and Company, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a *"Negotiated Fare"*). Company shall consider all such requests from you in good faith.

(*Id.* ¶ 4.1 (emphasis in original).)

With respect to Uber's remittance obligations, the Agreement reads:

Company agrees to remit to you on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If you and Uber have separately agreed, Company may deduct other amounts from the Fare prior to remittance to you (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.).

(*Id.* ¶ 4.1.) The referenced "Service Fee" for the service Uber provided to drivers through the App was paid by drivers on a "per Transportation Services transaction basis calculated as a percentage

---

[4] The distinction between "Fare" as a contractually-defined term, *i.e.*, with an upper-case "F," and the word "fare" (with a lower-case "f") is significant for purposes of this Order. The contractually-defined term "Fare" is used to describe the sum calculated pursuant to the default Fare Calculation, while "fare" is used herein generally to describe the sum that drivers charged riders for a single instance of transportation services.

3

of the Fare (regardless of any Negotiated Fare), as provided or otherwise made available by Company . . . ." (*Id.* ¶ 4.4.) The so-called "Service Fee Schedule," which Paragraph 4.4 of the Agreement incorporates by reference, in turn provides:

> In exchange for your access to and use of the Software and Service, including the right to receive the Requests, you agree to pay to the Company a fee for each Request accepted, in the amount of 20% . . . of the total fare minus the $1 Safe Rides Fee, calculated pursuant to the rate schedule below.

**Rates**

|  | uberX | uberXL |
|---|---|---|
| Base Fare | $1.00 | $3.00 |
| Per Mile | $0.75 | $1.45 |
| Per Minute | $0.13 | $0.25 |
| Safe Rides Fee | $1.00 | $1.00 |
| Minimum Fare | $4.00 | $7.00 |
| Cancellation Fee | $5.00 | $5.00 |

(Dkt. No. 49-6 at ECF 2 ("Service Fee Schedule") (emphasis in original).)[5]

**B.      Minimum Fares and Cancellation Fees**

The Fare Calculation provision does not reference cancelled rides or so-called "minimum fare" rides. In fact, the latter is not referenced or defined in the Agreement other than the "Minimum Fare" rate notation on the Service Fee Schedule. By contrast, with respect to cancelled rides, the Agreement provides:

> You acknowledge and agree that Users may elect to cancel requests for Transportation Services that have been accepted by you via the Driver App at any time prior to your arrival. In the event that a User cancels an accepted request for Transportation Services, Company may charge the User a cancellation fee on your behalf. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder.

---

[5] Because the parties have principally relied on the Service Fee Schedule effective as of January 9, 2015 in their briefing, which reflects a Safe Rides Fee of $1.00 and a Minimum Fare of $4.00, this Order shall do the same. (*See* Plaintiffs' MSJ at 7, 15; Defendants' Cross-MSJ at 4, 6.) Thus, unless otherwise stated, all citations and references to the "Service Fee Schedule" pertain to the Service Fee Schedule effective as of January 9, 2015.

1  (Agreement ¶ 4.5.)  Thus, the Agreement designates the "cancellation fee" as a contractually-
2  defined "Fare" for the limited purpose of remittance to drivers, but it does not state that the
3  "cancellation fee" is calculated in accordance with the Fare Calculation.
4       As noted, the Agreement does not define or discuss minimum fare rides.  However, it is
5  undisputed that where the Fare Calculation yielded a sum less than a certain threshold sum (*i.e.*,
6  the "minimum fare"), drivers could choose to charge riders the minimum fare for that instance of
7  transportation service instead of the recommended Fare as calculated pursuant to the default Fare
8  Calculation (*i.e.*, base fare plus mileage and/or time).[6]  In this regard, both the driver and Uber
9  yielded more from the rider than the Fare Calculation would have provided.  Thus, the minimum
10 fare is a distinctly different fare.  As shown above, the specific minimum fare amount is set forth
11 in the Service Fee Schedule ("Minimum Fare").

### C. Safe Rides Fee

13      Uber instituted a "Safe Rides Fee" in April 2014 as part of its "continued efforts to ensure
14 the safest possible platform for Uber riders and drivers."  (Defendants' Cross-MSJ at 5 (internal
15 quotation marks omitted).)  As explained in an April 18, 2014 email sent to drivers, the $1.00 Safe
16 Rides Fee was to cover the cost of safety initiatives such as driver background checks and driver
17 safety education.  (Dkt. No. 49-1 at ECF 2 ("April 2014 Email").)  Uber informed drivers that it
18 would collect the flat fee of $1.00 from riders and that the increase in the fare would "not reduce
19 [drivers'] earnings."  (*Id.*)  Moreover, while the Safe Rides Fee would be included in the fare
20 displayed at the end of a trip, it would not appear on drivers' weekly payment statements.  (*Id.*)
21 Consistent with these assurances, Uber provided the following sample trip fare calculation to
22 drivers in its email, showing that the Safe Rides Fee was independent of the Fare (and, thus,
23 independent of the base fare, mileage, and time amounts):
24 \\
25 \\
26 \\

---

[6] *See* Plaintiffs' MSJ at 4; Defendants' Cross-MSJ at 5.

|  | Old | New (ridesharing) |
|---|---|---|
| Fare | $10.00 | $10.00 |
| Safe Rides Fee | -- | $1.00 |
| Total Rider Payment | $10.00 | $11.00 |
| Partner Earnings Description | 80% of Fare | 80% of Fare |
| Partner Earnings | $8.00 | $8.00 |

(April 2014 Email at ECF 3.) Thus, according to the April 2014 email, the Safe Rides Fee would be added on top of the Fare as an additional direct fee to the rider.[7]

The sample trip fare calculation only referenced a "Fare." (*Id.*) It did not reference a "Minimum Fare," nor did any part of the email notification. Nonetheless, Uber unilaterally, and concurrently with the implementation of the Safe Rides Fee, increased the sum it recommended drivers charge riders on minimum fare rides by $1.00. (Deposition of Alexander Priest, Dkt. No. 109-8 at 47:11–13; Defendants' Cross-MSJ at 5, 6–7.) Thereafter, Uber deducted from the total amounts riders paid a sum equal to the Safe Rides Fee on all rides prior to making its remittance to drivers. On Fare rides, the fares for which are calculated pursuant to the Fare Calculation (*i.e.*, base fare plus mileage and/or time), it is undisputed that Uber discretely charged the Safe Rides Fee to riders and collected it as an additional sum above the Fare that drivers charged riders for transportation services. No dispute exists that drivers had no right to the Safe Rides Fee on Fare rides.[8]

Uber also deducted $1.00 on minimum fare rides. This lawsuit challenges that conduct under the terms of the Agreement. Importantly, the parties stipulate that the terms of the Agreement are unambiguous and that Uber drafted the three agreements at issue.

\\

\\

---

[7] While other aspects of Uber's April 18, 2014 email varied by market, the section of the email notifying drivers of the implementation of the Safe Rides Fee was uniform across markets. (Deposition of Michael Colman, Dkt. No. 109-8 at 127:13–128:20, 134:16–25.)

[8] *See* Plaintiffs' MSJ at 7–8; Defendants' Cross-MSJ at 15–16.

**II.   CROSS MOTIONS FOR SUMMARY JUDGMENT**

**A.   Legal Standard**

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record"). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

The filing of cross-motions for summary judgment does not mean that material facts are undisputed, and the denial of one motion does not necessarily require the granting of the other. *See Regents of Univ. of Calif. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1077–78 (N.D. Cal. 2007). Rather, the district court must consider all the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001).

**B.   Discussion**

**1.   *Breach of Contract***

Under California law, the elements of a cause of action for breach of contract are: (1) the existence of the contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) damages to the plaintiff as a result of the breach. *Mazonas v. Nationstar Mortgage LLC*, No. 16-cv-00660-RS, 2016 WL 2344196, at *7 (N.D. Cal. May 4, 2016). Plaintiffs allege that Uber breached the Agreement by taking an amount equal to the Safe Rides Fee out of the "[d]river-owned" fares on minimum fare rides. (Plaintiffs' MSJ at 2.) Uber

argues that drivers' "earnings"[9] remained unchanged after it introduced the Safe Rides Fee and denies having breached the Agreement. (Defendants' Cross-MSJ at 1.) Uber further contends that what drivers "own" is 80% of the contractually-defined Fare (*i.e.*, base fare plus mileage and/or time) and that the Safe Rides Fee is not part of the Fare but rather a special fee *in addition to* the Fare. (Defendants' Cross-MSJ at 1, 17.)

### a. Rules Governing Contract Interpretation

"Interpretation of a contract is a matter of law, as is the determination of whether a contract is ambiguous." *Beck Park Apartments v. U.S. Dep't of Housing & Urban Dev.*, 695 F.2d 366, 369 (9th Cir. 1982); *see also Wolf v. Sup. Ct.*, 114 Cal. App. 4th 1343, 1351 (2004). "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation." *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998) (citing Cal. Civ. Code § 1636). When a court interprets a contract to determine the parties' intent, "[t]he whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Lockyer v. R.J. Reynolds*, 107 Cal. Ap. 4th 516, 525 (2003); *see also* Cal. Civ. Code § 1641.

The "clear and explicit meaning" of contractual provisions "interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." *Santisas*, 17 Cal. 4th at 608 (internal quotation marks and citations omitted); *see also* Cal. Civ. Code § 1644. "If the meaning a layperson would ascribe to contract language is not ambiguous," the Court applies that meaning. *Santisas*, 17 Cal. 4th at 608. Contract language is ambiguous if it is "capable of two or more constructions, both of

---

[9] In their response, plaintiffs claim that Uber has "change[d] Plaintiffs' theory of liability to one predicated on a change in 'earnings.'" (Dkt. No. 118 at 4.) While the Court acknowledges that Uber's use of the word "earnings" may potentially confuse the issues in a case involving independent contractors rather than employees, the Court understands "earnings" in Uber's briefing simply to mean the money Uber remitted to drivers pursuant to Paragraph 4.1 of the Agreement and the Service Fee Schedule. Moreover, Uber has explained that it used the word "earnings" to avoid confusion between lower-case-f "fare" and capital-F "Fare." (*See* Defendants' Reply to Cross-Motion for Summary Judgment, Dkt. No. 121 at 4 ("Defendants' Reply to Cross-MSJ").)

1    which are reasonable." *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 50 Cal. Rptr. 3d 597, 602–03
2    (2006).
3          Extrinsic evidence is generally not admissible to contradict or supplement the terms of a
4    fully integrated contract, but it may be used "to explain or interpret ambiguous contract language."
5    *Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP*, 201 Cal. App. 4th 368, 376 (2011).
6    A court "cannot consider such evidence if the language of the contract is not reasonably
7    susceptible of interpretation and is unambiguous." *John Hancock Ins. Co. v. Goss*, No. 14-cv-
8    04651-WHO, 2015 WL 5569150, at *3 (N.D. Cal. Sept. 1, 2015) (internal quotation marks
9    omitted). With respect to standard form contracts specifically,[10] "where neither party has asserted
10   that the . . . contract contains ambiguous terms, admission of extrinsic evidence should not be
11   necessary to interpret the contractual provisions at issue." *In re Conseco Life Ins. Co. LifeTrend*
12   *Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010). In the case of ambiguous terms
13   within a form contract, such terms would be construed against the drafter. *See Ellsworth v. U.S.*
14   *Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *22 (N.D. Cal. June 13, 2014) ("[W]ith
15   identical form contracts, courts in this district generally hold that extrinsic evidence is unlikely to
16   be important, and ambiguous terms would be construed against the drafter."); *c.f. Vedachalam v.*
17   *Tata Consultancy Servs.*, No. C 06-0963 CW, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012)
18   ("Even if Defendants could establish some ambiguity with extrinsic evidence, the ambiguous
19   terms would be interpreted against them, as the drafters of the form contract.").
20                 b.        Analysis
21       The parties agree that no genuine issues of material fact exist regarding (1) the existence of
22   the Agreement or (2) plaintiffs' performance under the Agreement. Rather, the motions focus on
23   the element of breach. Thus, the Court begins with the plain language of the Agreement.

---

[10] A "standard form contract," or "contract of adhesion," signifies "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 694 (1961).

9

1    Pursuant to Paragraph 4.1, certain variables might influence an individual driver's
2    remittance. Moreover, the Service Fee Schedule instructs that drivers are to pay Uber a certain
3    percentage "of the total fare minus the $1 Safe Rides Fee, *calculated pursuant to the rate schedule*
4    *below*." (Service Fee Schedule (emphasis supplied).) Thus, by the plain contractual language,
5    "total fare" is not calculated pursuant to the Paragraph 4.1 Fare Calculation and, accordingly, is
6    not limited to the sum of the three Fare components.

7    Because "total fare" is the product of addition based on the components shown in the
8    Service Fee Schedule,[11] the next question becomes *what components* on the schedule itself are to
9    be added or "total[ed]." The Schedule contains six components. With respect to the meaning of
10   "total fare" *in the context of Fare rides*, the Court does not include either the "Cancellation Fee"
11   component (since that fee applies only where a ride has been cancelled) or the "Minimum Fare"
12   component (since a Fare ride is not a minimum fare ride, by definition). The components from the
13   Service Fee Schedule that remain to add, or to "total," are "Base Fare," "Per Mile," "Per Minute,"
14   and the "Safe Rides Fee." Therefore, pursuant to the contractual language, the "total fare" in the
15   context of Fare rides equals the sum of these four independent components.[12]

16   With respect to the meaning of "total fare" *in the context of minimum fare rides*, the
17   components to add, or to "total," differ. In that context, the Court again excludes the
18   "Cancellation Fee" component, as well as the "Base Fare," "Per Mile," and "Per Minute"
19   components (given the nature of the "Minimum Fare," *i.e.*, a value greater than the sum resulting
20   from the Fare Calculation). The components from the Service Fee Schedule that remain to add, or

---

[11] This interpretation of "total fare" is supported by the dictionary definition of the word "total." Namely, Merriam-Webster's Online Dictionary defines "total" as, *inter alia*, "a product of addition." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/total (last visited March 8, 2018).

[12] The parties agree that "total fare" means "the fare that the Rider paid for transportation services, plus the additional dollar Uber added for the Safe Rides Fee." (Plaintiffs' MSJ at 15; *see also* Defendants' Cross-MSJ at 6.) Indeed, interpreting "total fare" to mean the same thing as Fare would be inconsistent with the latter term's contractual definition: "Fare is calculated based upon a base fare amount plus mileage and/or time amounts . . . ." Agreement ¶ 4.1; *see also Headlands Reserve, LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d, 113, 1126 (C.D. Cal. 2007) (noting contracts should be interpreted so as to give effect to each part and not in a way that would render any part meaningless).

to "total," are the "Minimum Fare" and the "Safe Rides Fee." Therefore, pursuant to the contractual language, the "total fare" in the context of minimum fare rides equals the sum of these two independent components.[13]

For the reasons set forth above, Uber's assertions that "Minimum Fare" should be defined as a "total fare" *inclusive* of the Safe Rides Fee do not persuade. (*See* Transcript at 13:16–21, 18:13–14; Defendants' Cross-MSJ at 6 n.9, 8.) The Service Fee Schedule identifies the terms "Minimum Fare" and the "Safe Rides Fee" as separate components that, *together*, make up the "total fare" in the context of minimum fare rides. As with the "total fare" in the context of Fare rides, the component parts of "total fare" in the context of minimum fare rides are to be treated separately, rather than treating the "Safe Rides Fee" as subsumed within the "Minimum Fare." Applying the Service Fee formula, and consistent with the formula used for Fares, Uber would receive a Service Fee in the amount of "20% . . . of the total fare [*i.e.*, the Minimum Fare plus the Safe Rides Fee] minus the $1 Safe Rides Fee." Thus, as stated within the context of the Service Fee Schedule referenced herein, Uber would receive "20% . . . of the total fare [$4 + $1] minus the $1 Safe Rides Fee," or 20% of ($5.00 - $1.00), which equals $0.80. Nothing in the Agreement indicates that Uber would necessarily collect the Safe Rides Fee in the context of minimum fare rides, given the unique character of those fares.

---

[13] The Service Fee calculation in the context of *cancelled rides* is unclear. The Agreement and Service Fee Schedule are silent as to whether a "Cancellation Fee" alone is deemed a "total fare" for purposes of remittance, or whether "total fare" in that context includes the "Cancellation Fee" component *and* the "Safe Rides Fee" component. Indeed, at oral argument, Uber's counsel admitted to not knowing the nature of the relationship between the "Cancellation Fee" and the "Safe Rides Fee." (*See* Transcript of Proceedings Held on October 31, 2017, Dkt. No. 128 at 14:8–22 ("Transcript").) Moreover, it is conceivable that the concept of "total fare" is wholly inapplicable in the context of cancelled rides. The dictionary defines "fare" as, *inter alia*, "the price charged to *transport a person*." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/fare (last visited March 8, 2018) (emphasis supplied). But when a ride is cancelled, no such "transport" occurs, and, thus, no such "fare" is charged.

It is also possible that the parties have assigned a special meaning to "total fare" in the context of cancelled rides. In any event, the Court need not address the remittance to drivers in the context of cancelled rides because only minimum fare rides are at issue in this litigation. The Court also does not predict how definitions in this context might relate to other disputes regarding the plain meaning of the Agreement.

1  Uber's reliance on its own *post hoc* conduct to justify its interpretation of the Agreement
2  begs the question. Such extrinsic evidence is not relevant. That Uber may have raised the
3  "Minimum Fare" by an amount equal to the Safe Rides Fee and drivers "earned exactly the same
4  amount after, as before, the SRF [Safe Rides Fee]" is irrelevant and a red herring. (Defendants'
5  Cross-MSJ at 12; *see also* Defendants' Reply to Cross-MSJ at 3 n.2.) As Uber would have it, its
6  decision to raise the suggested fare amount in the context of minimum fare rides by $1.00 allowed
7  it to extract unilaterally the $1.00 Safe Rides Fee from the "Minimum Fare," which, as noted
8  above, Uber argues is a type of "total fare" *inclusive* of the Safe Rides Fee. Nothing in the
9  Agreement provides a formula for Uber to deduct $1.00 from the Minimum Fare and then deduct
10 another 20% from the balance. The fact that Uber chose not to follow the precise terms of the
11 Agreement for the 19 months of the class period and is now attempting to rationalize its conduct is
12 not relevant to the instant claim.
13 By extracting $1.00 from the "Minimum Fare" before making its remittance to drivers,
14 Uber breached the plain terms of the Agreement. As shown above, it was contractually entitled
15 *only* to deduct 20% of the *total amount* charged on minimum fare rides, and the drivers were
16 entitled to 80% of the same.[14]

---

[14] Importantly, even if the Court were to lend credence to Uber's interpretation of the "Minimum Fare" as a "Safe Rides Fee"-inclusive "total fare," which it does not do for the aforementioned reasons, this would, at best, indicate that the Agreement was capable of two constructions. Assuming, for the sake of argument, that both constructions were reasonable, the Agreement would be deemed ambiguous. *See TRB Invs.*, 50 Cal. Rptr. 3d at 602–03. This outcome is significant in the context of this case, which involves standard form contracts. The rule of contract interpretation that ambiguous terms in a contract must be construed against the drafter applies "with peculiar force" in the case of standard form contracts. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015); *see also Birdie v. Bank of Am.*, 79 Cal. Rptr. 2d 273, 286 (1998) ("When ambiguities in a standardized contract . . . cannot be dispelled by application of the other rules of contract interpretation, they are resolved against the drafter."); *Tahoe Nat'l Bank v. Phillips*, 480 P.2d 320, 327 (1971) ("Since the alleged ambiguities appear in a standardized contract, drafted and selected by the bank, which occupies the superior bargaining position, those ambiguities must be interpreted against the bank."); *Neal*, 188 Cal. App. 2d at 695 ("Here, the party of superior bargaining power not only prescribes the words of the instrument but the party who subscribes to it lacks the economic strength to change such language. Hence, any ambiguity in the contract should be resolved against the draftsman, and questions of doubtful interpretation should be construed in favor of the subscribing party."). As the drafter of the form contracts at issue in the instant dispute, any ambiguities would be resolved against Uber.

### 2. *Damages*

Having concluded that drivers were contractually entitled to the full amount of the "Minimum Fare" on minimum fare rides, minus only Uber's contractual Service Fee and any separately-agreed amount pursuant to Paragraph 4.1 of the Agreement, Uber's extraction of an amount equal to the Safe Rides Fee from drivers' fares on minimum fare rides directly decreased Uber's remittance to drivers. Thus, there is no question that drivers were financially harmed by Uber's breach of contract.[15]

The Court therefore **GRANTS** plaintiffs' motion for summary judgment as to their breach of contract claim and **DENIES** Uber's cross-motion.

### 3. *Conversion*

"Under California law, a plaintiff must plead three elements to state a claim for conversion: (1) ownership or right to possession of personal property; (2) a defendant's wrongful interference with the claimant's possession; and (3) damage to the claimant." *Fields v. Wise Media, LLC*, No. C 12-05160 WHA, 2013 WL 3187414, at *7 (N.D. Cal. June 21, 2013). Due to the similarity between plaintiffs' conversion and breach of contract claims, the parties have stipulated that Uber's liability under plaintiffs' conversion claim "rise[s] and fall[s]" with plaintiffs' breach of contract claim. (Dkt. No. 106 Stipulated Fact 4.)

The Court therefore **GRANTS** plaintiffs' motion for summary judgment as to their conversion claim and **DENIES** Uber's cross-motion.

### III. MOTION FOR CLASS CERTIFICATION

Plaintiffs move to certify the following class as a damages class pursuant to Federal Rule of Civil Procedure 23(b)(3), with plaintiffs Matthew Clark, Ryan Cowden, Dominicus Rooijackers, and Jason Rosenberg as the class representatives:

> (A) all persons in the United States; (B) who entered the 2013 Agreement, the June 2014 Agreement, or the November 2014 Agreement, or a combination of those agreements; (C) opted-out of arbitration under the last Uber driver contract the

---

[15] The parties indicated at oral argument that the extent of the damages has not yet been determined. (*See* Transcript at 43:16–20.)

13

1   person executed; and (D) provided at least one minimum fare ride on the UberX platform for which a Safe Rides Fee applied before November 16, 2015.

2   (Class Cert. Motion at 3.)[16]  The class period runs from April 18, 2014, when Uber

3   implemented the Safe Rides Fee, to November 16, 2015, when Uber amended its local fare

4   webpages ("Class Period").

### A. Legal Standard

Under Rule 23(a), the Court may certify a class only where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Once plaintiffs establish that the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Where, as here, plaintiffs seek to qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites. Namely, common questions must "predominate over any question affecting only individual members," and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal quotation marks omitted).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]'" *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). The court considers the merits to the extent they overlap with the Rule 23 requirements. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011). Nevertheless, "Rule 23 grants courts no

---

[16] Excluded from this class are: (1) Uber; (2) the undersigned and the undersigned's immediate family; (3) persons who execute and file a timely request for exclusion from the class; (4) the legal representatives, successors, or assigns of any such excluded person; and (5) plaintiffs' counsel and Uber's counsel. (Class Cert. Motion at 3.)

14

1 license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at
2 466. If the court concludes that the moving party has met its burden of proof, then the court has
3 broad discretion to certify the class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186
4 (9th Cir. 2001).

### B.     Discussion

Uber concedes that plaintiffs have satisfied the numerosity, commonality, predominance, and superiority requirements for certification of the proposed Rule 23(b)(3) class. Uber contends only that plaintiffs are not typical (and for the same reasons are not adequate) and that the class definition is overbroad. With regard to typicality, Uber raises two arguments: (1) plaintiffs have no standing; and (2) plaintiffs' depositions have repudiated key averments in the FAC. The Court addresses each argument in turn, followed by a discussion of Uber's argument concerning the scope of the class definition.

#### 1.     *Typicality: Challenge Based on Lack of Standing*

As an initial matter, the parties dispute whether issues of standing are properly classified under the typicality requirement rather than as a separate issue. Uber argues that plaintiffs lack Article III standing and thus cannot be typical of a putative class. Plaintiffs respond that typicality does not involve an inquiry into plaintiffs' standing.

Uber does not persuade. The Ninth Circuit has distinguished questions of standing from the class certification analysis. In *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015), the Ninth Circuit explained that although "both concepts 'aim to measure whether the proper party is before the court to tender the issues for litigation, . . . [t]hey spring from different sources and serve different functions.'" *Id.* at 1261 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 2:6 (5th ed.)) (alterations in original). When faced with dissimilarities between the claims of the named plaintiffs and the claims of the class, courts have taken either: (1) a "standing approach," wherein they characterize the dissimilarity as "depriv[ing] the named plaintiff of standing to obtain relief for the unnamed class members"; or (2) a "class certification approach," wherein "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for

15

class certification have been met." *Id.* at 1261–62 (internal quotation marks omitted).  In *Melendres*, the Ninth Circuit held that it was adopting the "class certification approach," thus treating the standing analysis as separate from the typicality analysis. *Id.* at 1262.

Uber raised standing previously in the context of its motion to dismiss, which the Court summarily denied.  Its standing argument in that context was essentially the same as it is here—that plaintiffs suffered no injury because drivers' fares were not reduced by the amount of the Safe Rides Fee on minimum fare rides. (*See* Dkt. No. 69 at 12.)[17]  Uber's attempt to interject a merits-based argument into a Rule 23 analysis is unavailing.  The proper question to assess typicality is whether plaintiffs suffered the *same type* of injury, assuming injury can be proven, as a result of Uber's allegedly wrongful conduct. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (internal quotation marks omitted).  Uber's argument that plaintiffs have suffered no injury is an inquiry to be solved by the action.[18]  Thus, Uber's assertion that plaintiffs have no standing is predicated on circular reasoning.  Aside from the fact that Uber does not distinguish between plaintiffs' claims for damages and the class members' claims for damages, each suffered the same injury based on Uber's collection of the Safe Rides Fee, which was improper under the same contractual arrangements.[19]

---

[17] In fact, Uber conceded at oral argument that its response to plaintiffs' class certification motion "is a merits argument." (Transcript at 38:16–18.) As the Ninth Circuit has explained, Article III standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1109 (9th Cir. 2014) (internal quotation marks omitted). In any event, since plaintiffs have prevailed on the merits as set forth above, the Court has determined that they suffered an injury.

[18] *Compare* Defendants' Opposition to Plaintiffs' Motion for Class Certification, Dkt. No. 115 at 4–8, *with* Defendants' Cross-MSJ at 8–9, 12–15.

[19] Uber's alternative argument with respect to standing, that is, that plaintiffs cannot show the damages element of their claims, fails for the same reasons.

16

### 2. *Typicality: Challenge Based on Deposition Testimony*

Uber additionally argues that plaintiffs are neither typical nor adequate representatives because they have each disavowed the central allegations in the FAC. In support of its argument, Uber cites to various excerpts from plaintiffs' deposition testimony, which allegedly show that all four understood the April 2014 email to mean that drivers were not entitled to the Safe Rides Fee. Plaintiffs do not rebut each instance of deposition testimony individually, but they argue that Uber's questioning at the depositions was based on its theory that the Safe Rides Fee was charged *on top* of drivers' fares. Thus, plaintiffs contend, based on the hypothetical scenarios posed to them at their depositions, they each answered that they were entitled only to 80% of the "Minimum Fare" *not* including the SRF. Plaintiffs reiterate their theory that for minimum fare rides, Uber did not add the Safe Rides Fee on top of the "Minimum Fare" as it represented it would. Plaintiffs maintain that, in that context, their claims are typical of the claims of the class.

Uber does not persuade. Again it asks the Court to make a merits determination that the Agreement actually allowed Uber to collect the Safe Rides Fee in the manner that it did during the Class Period. However, the central complaint is that the Agreement did not so provide. Whether that is correct is irrelevant for class certification purposes. As discussed above, for purposes of typicality, it is enough to find that plaintiffs' theory of their injury is the same theory of injury for the entire class.[20]

---

[20] Uber cites two denials of class certification issued by this Court in support of its argument that plaintiffs are not typical because they have repudiated the key averments of the FAC. However, these two cases are distinguishable from the matter at hand because they involved plaintiffs with theories of damages significantly different from the theory of the putative class. *Corcoran v. CVS Health*, No. 15-cv-03504-YGR, 2017 WL 1065135, at *8–10 (N.D. Cal. Mar. 21, 2017); *McKinnon v. Dollar Thrifty Auto. Grp.*, No. 12-cv-04457-YGR, 2016 WL 6582045, at *9–10 (N.D. Cal. Nov. 7, 2016). Here, all the drivers' claims rise and fall with the Court's interpretation of the Agreement. An individual interpretation does not control.

Other cases Uber cites are similarly inapposite. *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (proposed class representative who insisted he was not really deceived into joining rewards program, but who must have accidentally joined, was not typical of proposed class of consumers who were allegedly deceived into enrolling in rewards program); *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *7 (N.D. Cal. June 13, 2014) (in putative class action about allegedly deceptive and misleading labels on food products, proposed class representative who admitted that the statement she relied on was not misleading was deemed inadequate); *Turner v. Diversified Adjustment Serv., Inc.*, No. 00 C 463,

The Court thus finds that the typicality and adequacy requirements for class certification are satisfied.

### 3. *Challenge Based on Scope of Class Definition*

Uber further argues that to the extent plaintiffs' case for liability relies on Uber's purported assurance in it April 2014 email that riders would pay the Safe Rides Fee, not drivers, the class is overbroad. In relevant part, the April 2014 email states: "For now, the Safe Rides Fee will be included in the fare displayed at the end of a trip, but will not appear on the weekly payment statement. If you are a ridesharing partner, Uber will collect the $1 Safe Rides Fee from the rider, so that this price increase will not affect your earnings." (April 2014 Email at ECF 2.) Thus, Uber contends that if plaintiffs' theory rests on this email, the class must be limited to drivers who activated their Uber accounts prior to May 2014 as those who did so subsequently would not have received the email. Plaintiffs state that the April 2014 email is not dispositive, but merely provides context for the Agreement. Thus, plaintiffs argue, receipt of the email should not be deemed necessary for class membership, but if it were, the proper course would be to create two subclasses rather than denial of class certification.

The parties do not elaborate much on these arguments. However, because receipt of the April 2014 email has no bearing on plaintiffs' claims for breach of contract and conversion, as evidenced by the Court's contractual analysis above, it has no effect on the Court's class certification analysis.

## IV. CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

1. The Court **GRANTS** plaintiffs' motion for summary judgment.

2. The Court **DENIES** Uber's cross-motion for summary judgment.

3. The Court **GRANTS** plaintiffs' motion for class certification under Rule 23(b)(3) and **CERTIFIES** the following class: All persons in the United States who (A) entered the 2013

---

2000 WL 748124, at*2 (N.D. Ill. May 31, 2000) (in putative FDCPA class action suit, plaintiff's disclaimer of any confusion on his own part weighed against typicality and adequacy).

18

Agreement, the June 2014 Agreement, or the November 2014 Agreement, or a combination of those agreements; (B) opted out of arbitration under the last Uber driver contract the person executed; and (C) provided at least one minimum fare ride on the UberX platform for which a Safe Rides Fee applied before November 16, 2015.[21]

4. The Court **APPOINTS** named plaintiffs Matthew Clark, Ryan Cowden, Dominicus Rooijackers, and Jason Rosenberg as class representatives of the certified class.

5. The Court **APPOINTS** John G. Crabtree, Charles M. Auslander, George R. Baise, Jr., and Brian Tackenberg of Crabtree & Auslander, LLC, Andrew A. August of Browne George Ross, LLP, and Mark A. Morrison of Morrison and Associates as class counsel.

This Order terminates Docket Numbers 108, 109, and 114.

**IT IS SO ORDERED**.

Dated: March 8, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[21] The Court has modified slightly plaintiffs' proposed class definition such that "[A]ll persons in the United States" is not its own subpart.